RANDOLPH–SHEPPARD VENDORS
OF AMERICA, et al., Plaintiffs,

v.

Caspar W. WEINBERGER, et
al., Defendants.

NATIONAL COUNCIL OF STATE
AGENCIES FOR THE BLIND, et
al., Plaintiffs,

v.

Caspar W. WEINBERGER, et
al., Defendants.

Civ. A. Nos. 84–3211, 84–3489.

United States District Court,
District of Columbia.

Jan. 7, 1985.

Robert R. Humphreys, Humphreys & Mitchell, Washington, D.C., for plaintiffs.

Rebecca L. Ross, Asst. U.S. Atty., Washington, D.C., for defendants.

Stephen N. Shulman, Cadwalader, Wickersham & Taft, Washington, D.C., for intervenor.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this consolidated litigation, representatives of several blind vendor groups and interested individuals challenge two procurements awarded by the Secretary of Defense on the grounds that they violate the provisions of the Randolph-Sheppard Act ("Act"), 20 U.S.C. § 107 *et seq.* The Act authorizes licensed blind persons to operate vending facilities on any Federal property and was enacted for the "purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting." *Id.,* § 107(a).

The procurement awards authorized the construction and operation of fast-food facilities on military bases by McDonald's Corporation ("McDonald's") and Burger King Corporation ("Burger King"). In *Randolph Sheppard Vendors of America v. Weinberger,* C.A. No. 84–3211, the plaintiffs challenge the award of a Navy contract to McDonald's. *National Council of State Agencies v. Weinberger,* C.A. No.

84–3489, presents a challenge to a contract award by the Army and Air Force to Burger King. The two proceedings were consolidated as related cases involving the same statute and presenting similar factual and legal issues. In each proceeding, the plaintiffs request declaratory and injunctive relief, which if granted, would result in the termination of the two contracts. McDonald's was granted leave to participate as a defendant-intervenor in C.A. No. 84–3211 on December 17, 1984.

The plaintiffs in both actions are the National Council of State Agencies for the Blind ("National Council"), the Randolph-Sheppard Vendors of America ("Randolph-Sheppard Vendors") and its president, Paul Verner, the Blinded Veterans Association, Inc. ("Blinded Veterans"), the Association for the Education and Rehabilitation of the Blind and Visually Impaired ("Association"), the American Council of the Blind ("American Council"), the Affiliated Leadership League of and for the Blind of America ("Affiliated Leadership League"), and Senator Jennings Randolph, the chief sponsor of the Act and its amendments.

On December 19, 1984, the Court heard argument in the *Randolph-Sheppard Vendors of America* proceeding on the motions to dismiss filed by the government and McDonald's, and the plaintiffs' motion for a preliminary injunction. It was agreed among the parties that the arguments advanced would apply equally to the *National Council of State Agencies* proceeding in which similar motions were pending. At the conclusion of the hearing, the parties stipulated that on basis of the argument, memoranda of points and authorities, affidavits and exhibits, it was appropriate for the Court to consider and resolve the merits of the two proceedings. The government also agreed to halt ongoing construction on the majority of the fast-food facilities authorized under the contract awards until January 4, 1985, by which time a final ruling on the merits would be rendered by the Court.

The issues in this case require resolution of threshold jurisdictional questions of standing and the availability of administrative remedies, as well as the ultimate issue of whether the procurement decisions of Secretary Weinberger violated the Randolph-Sheppard Act.

With respect to the question of jurisdiction, the Court finds that all but four of the plaintiffs have standing to litigate these issues. The Court also determines that the plaintiffs were not required to exhaust their administrative remedies under the particular circumstances of this case. While the Defense Department's apparent insensitivity to the plight of the blind vendors is deplored and there remain troublesome and vexing questions as to whether or not the Department has complied with the spirit of the law, the Court finds that the procurements complied with the minimum requirements of the letter of the Randolph-Sheppard Act.

## THE BLIND VENDORS PROGRAM

Before addressing the central issues presented by the parties, a brief description of the operation of the blind vendors program and a summary of the undisputed material facts is warranted. In a Stipulation of Facts, filed January 2, 1985, the parties agreed to many of the relevant facts.

The Randolph-Sheppard Act was first enacted in 1936, and amended in 1954 and 1974. The Act was designed to provide employment opportunities to licensed blind persons and to give preference to blind operators of vending stands on federal property. S.Rep. No. 937, 93d Cong., 2d Sess. 4 (1974) ("Senate Report"). Congress believed that

the property of the Federal government should be more fully and freely utilized in expanding the vending stand program for the blind, and that no department or agency should be permitted to refuse suitable stand locations to this blind program except where such stand would

clearly conflict with the proper functioning of the department or agency.

*Id.* at 7.

This program is run under the auspices of state agencies for the blind, which are designated by the Secretary of Education.[1] The state agencies bear a substantial responsibility for administering the blind vendor program. They seek permits for the establishment of vending facilities on federal property, 34 C.F.R. § 395.16, 395.35, and issue operating licenses to blind vendors. 20 U.S.C. § 107a(a)5; 34 C.F.R. § 395.7(b). These vending facilities include "automatic vending machines, cafeterias, snack bars, cart services, shelters, counters, and such other appropriate auxiliary equipment" for the sale of a wide variety of items, 20 U.S.C. § 107e(7), including "newspapers, periodicals, confections, tobacco products, foods, beverages, and other articles or services dispensed automatically or manually." *Id.*, § 107a(a)(5).

In addition, state licensing agencies may request arbitration of any dispute with the federal government concerning compliance with the Act. Specifically,

> [w]henever any State licensing agency determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this Act [20 U.S.C. §§ 107 et seq.] or any regulations issued thereunder (including a limitation of the placement or operation of a vending facility as described in section 1(b) of this Act [20 U.S.C. § 107(b)] and the Secretary's determination thereon) such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 6 of this Act [20 U.S.C. § 107d–2] and the decision of such panel shall be final and binding on

the parties except as otherwise provided in this Act [20 U.S.C. § 107(b)].

20 U.S.C. § 107d–1(b).

## FACTUAL BACKGROUND

On April 2, 1984, the Army and Air Force Exchange Service ("AAFES") issued a solicitation for proposals to establish an exclusive franchise agreement for AAFES to operate fast-food hamburger facilities at selected Army and Air Force installations nationwide. The contract was awarded to Burger King on May 15, 1984. Under the contract, AAFES will manage the franchise operation directly, using its own supplies, equipment and personnel. The contract is designed to phase in as many as 185 franchise facilities during the next five years, and provides for the construction of a maximum of 24 franchise sites during 1985.

On June 5, 1984, the Navy Resale and Services Support Office ("NAVRESSO") requested proposals for procurement of fast-food hamburger operations to be located at Naval installations throughout the United States and overseas. Proposals were solicited from offerors who were "nationally recognized fast-food hamburger organizations." McDonald's was awarded a contract on August 7, 1984 for the construction and operation of a minimum of forty and a maximum of 300 hundred restaurants. Sixty-four restaurants are currently targeted for construction in sixteen states, Puerto Rico, Guam and in several foreign countries. Construction has already begun on at least four of these facilities.

The Department of Defense became aware of the plaintiffs' concerns about the two procurements as early as June of 1984. At that time, Senator Randolph wrote Secretary of Defense Weinberger, expressing his concern that the fast food operations of the military exchange services violated the Act. Ex. A.[2] In a response dated July 30,

---

**1.** The Rehabilitation Services Administration, a component of the Department of Education, is the principal governmental entity bearing responsibility for carrying out the Act. 20 U.S.C. § 107a(a)(1).

**2.** Unless otherwise noted, the exhibits cited in this Memorandum Opinion are attached to the

affidavit of plaintiffs' attorney Robert Humphreys in Support of Motion for Preliminary and Permanent Injunction (C.A. No. 84–3211), filed Nov. 19, 1984. An identical affidavit and accompanying exhibits were filed in C.A. No. 84–3489.

1984, Secretary Weinberger indicated that the Department of Defense "claimed no exemption from the Randolph-Sheppard Act in conjunction with providing nationally known fast-food service. To the contrary, we would be pleased to have the participation of the state blind licensing agencies." Ex. B. Secretary Weinberger did not explicitly address Senator Randolph's concern that the procurement request violated the Act by failing to provide adequate opportunities for blind vendors.

Shortly thereafter, the Department of Education also relayed its concerns about the procurements to the Department of Defense. Theodore Bell, the Secretary of Education, wrote Secretary Weinberger to request his analysis of the legality of the fast-food procurements under the Act. Ex. L. He noted that

[s]ince blind vendors licensed under the Randolph-Sheppard program cannot now meet this multi-state requirement [of providing fast food facilities in at least several states], they were precluded from responding to the Request for Proposals (RFP). I am concerned that, as a result, the RFPs may have failed to afford blind vendors an opportunity to be considered for the priority envisioned for them in the Act. I am also concerned that the multi-state requirements [ ] may constitute a limitation on the placement or operation of a Randolph-Sheppard facility that, under 20 U.S.C. § 107(b), must be cleared in advance by the Secretary of Education. It is my understanding that those requirements were not submitted for clearance.

The record does not indicate that Secretary Weinberger responded to this request.

In a recent September 13, 1984, response to a Freedom of Information Act request initiated by one of the plaintiffs, the American Council of the Blind, George Conn, the Commissioner of the Rehabilitation Services Administration, expressed views similar to Secretary Bell's:

[t]he Department has taken the position that the issuance of a request for proposal by a Federal entity which restricts

applications only to fast-food concerns capable of operating in numerous States appears to impose a limitation on the placement of Randolph-Sheppard vending facilities. Under Section 107(b) of the Randolph-Sheppard Act such limitation may be imposed by a Federal entity only if justification has been provided to the Secretary of the Department of Education and the Secretary has determined that it would be adverse to the interests of the United States to deny the limitation.

Ex. I. It is undisputed that the Department of Defense has not submitted the two procurements to the Secretary of Education for approval. *See* 20 U.S.C. § 107(b).

During this same time period, the House Appropriations Committee also discussed the applicability of the Randolph-Sheppard Act to the McDonald's contract. In a September 26, 1984 report dealing with the 1985 Department of Defense Appropriations bill, the Committee stated:

Information provided to the Committee indicates that the methods used by the Department in contracting for [the McDonald's] food service operation circumvented, if not the letter of the law, at least the spirit of the law.

The Committee directs that the Department of Defense review its policies concerning contracting out for food service operations to determine if those policies comply with the Randolph-Sheppard Act. In addition, the Department should determine if every opportunity was given to the state licensing agents who represent blind vendors to bid for these contracts. A report addressing these issues should be provided to the Committee by March 1, 1985.

H.Rep. No. 1086, 98th Cong., 2d Sess. 24 (1984) ("House Report").

Several of the plaintiffs filed a protest against the McDonald's contract with the General Accounting Office ("GAO"). The protest was dismissed on September 6, 1984 because the GAO lacked jurisdiction over a bid protest concerning a nonappropriated fund activity. Ex. H. The consoli-

**1012**

dated complaints now under consideration were then filed: *Randolph-Sheppard Vendors of America*-on October 18, 1984 and *National Council of State Agencies for the Blind*-on November 16, 1984. The plaintiffs have not pursued the arbitration procedures outlined in sections 107d–1 and 107d–2 of the Act and the accompanying regulations at 34 C.F.R. § 395.37.

## LEGAL ANALYSIS

### A.

### STANDING

A challenge to the award of a federal contract is subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 841 n. 2 (D.C.Cir.1982). Under the APA, any "person suffering legal wrong ... or adversely affected or aggrieved by agency action within the meaning of a relevant statute" has standing to obtain review of the administrative action. 5 U.S.C. § 702. Under this standard, a plaintiff must at a minimum "demonstrate that the challenged acts have harmed him or that he personally would benefit in some tangible manner from the court's intervention in the controversy." *Public Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 714 (D.C.Cir.1977). A plaintiff must proffer facts in support of his allegations of harm if these allegations are controverted by the defendants. *Id.* at n. 22. Here, the plaintiffs' allegations of harm are set forth in their Motions for Preliminary and Permanent Injunction ("Plaintiffs' Motion"), filed Nov. 19, 1984 (84–3211) and Nov. 30, 1984 (84–3489),[3] their Response to the Government's Motion to Dismiss and Defendant-Intervenor's Motion to Dismiss ("Plaintiffs' Response"), filed Dec. 18, 1984, and several affidavits.

The plaintiffs in this action fall into two categories for purposes of determining the question of standing: individual plaintiffs

and associational plaintiffs. The individual plaintiffs are Senator Jennings Randolph, the sponsor of the Act, and Paul Verner, in his capacity as a licensed blind vendor. Mr. Verner also brings suit in his capacity as President of the Randolph-Sheppard Vendors. The associational plaintiffs are the National Council, the Randolph-Sheppard Vendors, the Blinded Veterans, the Association, the American Council, and the Affiliated Leadership League. Although the Court finds that the individual plaintiffs, the Association, and the Affiliated Leadership League do not have standing to challenge these contracts, the remaining plaintiffs are properly before the Court. The findings with respect to the individual plaintiffs and the associational plaintiffs are discussed in turn.

### Individual Plaintiffs

Senator Randolph asserts that his special status as the sponsor of the Act and his lifelong advocacy of programs and services for the blind and the visually impaired entitles him to challenge these actions. In short, he claims standing on the basis of his membership in the Senate.

A legislator, however, lacks standing in the absence of an allegation of a specific injury to his statutory or constitutional rights. *See, e.g., Moore v. United States House of Representatives*, 733 F.2d 946, 951 (D.C.Cir.1984) (alleged violation of constitutional requirement that all revenue bills originate in the House); *American Federation of Government Employees, AFL–CIO v. Pierce*, 697 F.2d 303, 305 (D.C.Cir.1982) (per curiam) (alleged deprivation of specific statutory right as member of appropriations committee to approve reorganization of the Department of Housing and Urban Development). As this Circuit cautioned in *Harrington v. Bush*, 553 F.2d 190, 214 (D.C.Cir.1977):

To accept [generalized concerns of Congressional interest as] grounds for standing would in effect allow *any* Congres-

---

**3.** Since the two motions are nearly identical, the citation to "Plaintiffs' Motion" refers to the earlier-filed motion.

sional suit to challenge executive action, and an individual legislator would have a roving commission to obtain judicial relief under most circumstances. This would lead inevitably to the intrusion of the courts into the proper affairs of the coequal branches of government (emphasis added).

Although Senator Randolph's authorship of the Act and his intervention in the subject matter of this litigation are noteworthy and deserving of praise, they merely establish an interest in the proper execution of the law. This interest amounts to a generalized grievance which is too intangible to confer standing. *American Federation of Government Employees,* 697 F.2d at 305.

 Paul Verner has alleged that he is a licensed blind vendor who operates a cafeteria in Tampa, Florida (Plaintiffs' Motion at 14); however, he has not advanced any facts in support of his claim that he faces potential injury from "the overall negative effect upon the Randolph-Sheppard program as well as the loss of specific employment opportunities." Plaintiff's Response at 4. He does not allege that he desires to run a fast-food operation in Tampa, nor does he describe how his cafeteria business would be harmed by the construction of a McDonald's or a Burger King. In the absence of such allegations, Mr. Verner cannot show harm stemming from the procurements.

**Associational Plaintiffs**

 The question of the standing of the associational plaintiffs—the National Council, the Randolph-Sheppard Vendors, the Blinded Veterans, the Association, the American Council, and the Affiliated Leadership League—to challenge the two procurements is more difficult to resolve. An association may seek relief for injuries suffered in its institutional capacity, as well as injuries suffered in its capacity as a representative of its members. *Public Citizen v. Lockheed Aircraft Corporation,* 565

F.2d at 714. For purposes of institutional standing, an associational plaintiff must show some palpable injury to its own interests or activities, as distinct from injuries to its members. *Community Nutrition Institute v. Block,* 698 F.2d 1239, 1253–54 (D.C.Cir.1983), *rev'd on other grounds,* —— U.S. ——, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). In contrast, an associational plaintiff has standing to bring suit in a representative capacity even in the absence of injury to the association itself. *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 342, 97 S.Ct. 2434, 2440, 53 L.Ed.2d 383 (1977). If the association brings suit as a representative of its members, it must show that:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. at 2441.

Although the associational plaintiffs have not clearly articulated their basis for standing, it appears that they seek standing both in their institutional and their representational capacities. *See* Plaintiffs' Motion at 14–16. All of the associational plaintiffs are membership organizations concerned with the interests of blind individuals. Specifically, the National Council is a membership organization of state licensing agencies. The Blinded Veterans, American Council of the Blind, and the Randolph-Sheppard Vendors are organizations whose members include blind vendors. *Id.* at 15–16. The Affiliated Leadership League and the Association are advocacy organizations for the blind; they do not aver that their membership includes blind vendors. *Id.*[4]

 The gist of the plaintiffs' complaint is that the procurement of the two fast-food contracts on a national scale violated the rights of blind vendors under the

---

**4.** The suggestion that the Association's membership includes blind vendors was first articulated by the plaintiffs in their Response to the Mo-

tions to Dismiss at 3, and is insufficient to confer standing.

Act. When the issue is framed in this fashion, it appears that the Blinded Veterans, the American Council, and the Randolph-Sheppard Vendors, the three organizations whose members include blind vendors, have standing in their representational capacities to challenge the contract proposals. Individual blind vendors are "within the class of persons whose interests are necessarily, or with substantial probability, affected by the challenged agency action." *Public Citizen*, 565 F.2d at 716. Several state licensing agencies have indicated that blind vendors could provide fast-food services to the Department of Defense if those services were contracted for on a smaller scale. See Affidavit of Joseph Snyder (Chairman of the Randolph-Sheppard Committee of the National Council) at ¶ 4 and attached exhibits filed December 19, 1984; Affidavit of Donald Wedewer (Director of Florida state licensing agency) at ¶ 8, filed Dec. 28, 1984. As representatives of blind vendors who could not meet the large scale requirements of the contracts, these plaintiffs have adequately alleged tangible injury.

Although the associational plaintiffs need not "state with certainty which of the[ir] members [ ] will be harmed," *American Maritime Association v. Blumenthal*, 458 F.Supp. 849, 855 (D.D.C.1977), *aff'd* 590 F.2d 1156 (1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979), at least one organization represents a member who has alleged concrete injury from the McDonald's procurement. A blind vendor in Illinois has alleged that he would request the opportunity to operate a fast-food facility at the Great Lakes Naval Station if the Illinois State licensing agency had been able to bid for operations at that location. Affidavit of Tyrone McDonald at ¶ 10, filed Dec. 28, 1984. Mr. McDonald is also a member of the Board of Directors of the Randolph-Sheppard Vendors. *Id.* at ¶ 3. The submission of this affidavit strengthens the claim that this plaintiff has standing to challenge the McDonald's procurement.

As a membership organization of state licensing agencies, the National Council has an equally strong claim to standing in this action. The state licensing agencies are responsible under the Act for obtaining employment for blind individuals on federal property. *See* 20 U.S.C. § 107a. This responsibility necessarily includes seeking contracts with the federal government for vending facilities. Since the defendants have acknowledged that the state agencies, as representatives of blind vendors, do not have the capacity to provide fast food services on a nationwide scale, the inclusion of this requirement constitutes a perceptible and specific injury to the state agencies and the blind vendors they supervise. *See Public Citizen*, 565 F.2d at 715. Thus, the same affidavits which establish injury to the blind vendors also establish injury to the state licensing agencies and their representative. *See supra* at 1013.

The position of the two blind advocacy membership organizations, the Association for the Education and Rehabilitation of the Blind and Visually Impaired and the Affiliated Leadership League of and for the Blind of America is quite different. The members of the Association are professionals who train blind persons for employment and are generally interested in improving services for the blind. Plaintiffs' Motion at 15. The Affiliated Leadership League is a nonprofit coalition of organizations that seek improved services for the blind. Plaintiffs' Motion at 16. These plaintiffs have not alleged that their membership includes blind vendors. *Id.* at 15–16. The interests of these organizations and those of their members are thus too attenuated to establish standing. *See Community Nutrition Institute*, 698 F.2d at 1253–54. Accordingly, the Association and the Affiliated Leadership League are precluded from litigating the issues in this case on the merits.

**B.**

**EXHAUSTION**

Next, the Court turns to the government's claim that the complaint should be dismissed because the plaintiffs have failed

to exhaust their administrative remedies under the Randolph-Sheppard Act. It is unquestionable that at least one affected group—the state licensing agencies—could have sought administrative review of the procurement decisions by seeking arbitration from the Department of Education. The scope of arbitrable issues is broadly defined in 20 U.S.C. § 107d–1(b) to include challenges to a government entity's

> fail[ure] to comply with the provisions of this Act [20 U.S.C. § 107 et seq.] or any regulations issued thereunder (including a limitation of the placement or operation of a vending facility as described in section 1(b) of this Act [20 U.S.C. § 107(b)]) and the Secretary's determination thereon)...

Although this language is straightforward on its face, it presents several difficult questions of interpretation. First, the opportunity to pursue arbitration may not be limited solely to the entities listed in the statute. In interpreting similar language in 20 U.S.C. § 107d–1(a) concerning blind vendors' grievances, one federal court has held that the Committee of Blind Vendors for the State of Massachusetts should pursue arbitration. *See Massachusetts Elected Committee of Blind Vendors v. Matava*, 482 F.Supp. 1186, 1189 (D.Mass.1980). By analogy, the opportunity to pursue arbitration may. also extend to other membership organizations of blind vendors and state licensing agencies.

Second, the courts have differed in their analysis of whether arbitration is mandatory or permissive. In the context of blind vendors' challenges to the actions of state licensing agencies, two federal courts have held that blind vendors must exhaust their arbitration remedies before seeking relief in federal court. *Fillinger v. Cleveland Society for the Blind*, 587 F.2d 336, 338 (6th Cir.1978); *Massachusetts Elected Committee of Blind Vendors*, 482 F.Supp. at 1189. On the other hand, dicta in a

recent Court of Claims decision suggests that federal jurisdiction does not require prior resort to arbitration. *See Texas State Commission for the Blind v. United States*, 6 Cl.Ct. 730 at 735–36 n. 12 (1984).

Moreover, in *Randolph-Sheppard Vendors of America, Inc. v. Harris*, 628 F.2d 1364 (D.C.Cir.1980), this circuit ruled on the merits of a challenge to regulations promulgated under the Act. There, the court was well aware of the internal arbitration procedures, *id.* at 1368, but did not find that these procedures presented any bar to federal jurisdiction. Thus, it is at least arguable that certain broad challenges to the implementation of the Act are not proper subjects for arbitration.

The Court, however, need not consider the precise scope of the arbitration requirement. As this circuit has noted, "the exhaustion requirement contemplates an efficacious administrative remedy, and does not obtain when it is plain that any effort to meet it would come to no more than an exercise in futility." *Lodge 1858, American Federation of Government Employees v. Paine*, 436 F.2d 882, 896 (D.C.Cir. 1970).

In this instance, the plaintiffs were not required to pursue any available arbitration remedies because any resort to arbitration would have been futile. The plaintiffs seek immediate declaratory and injunctive relief with respect to two government procurements which are already under way. It is estimated that an arbitration procedure under the Act would require considerable time to complete.[5] The rights which the plaintiffs seek to vindicate would be lost in the absence of a speedy ruling, even if the Court were to rule in their favor on the merits. Thus, the pragmatic considerations of this case preclude the application of any arbitration requirement.

---

**5.** Robert Humphreys, counsel for the plaintiffs, has estimated that the arbitration proceeding would take approximately one and one-half years to complete. Mr. Humphreys has had considerable experience in drafting the Ran-

dolph-Sheppard Act, and has served as Special Counsel to the Senate Committee on Labor and Public Welfare and as the Commissioner of the Rehabilitation Services Administration. The defendants have accepted his time estimates.

## C.

### THE REQUIREMENTS OF THE RANDOLPH–SHEPPARD ACT

■ Lastly, the Court turns to the merits of the plaintiffs' claim that the two fast-food procurements violated the Randolph-Sheppard Act, 20 U.S.C. § 107(b). Section 107(b) provides in relevant part that:

[i]n authorizing the operation of vending facilities on Federal property, priority shall be given to blind persons licensed by a state agency

\* \* \* \* \* \*

(2) whenever feasible, one or more vending facilities are established on all Federal property to the extent that any such facility or facilities would not adversely affect the interests of the United States.

Any limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary [of Education], who shall determine whether such limitation is justified.

The plaintiffs give a very broad reading to the language which grants a priority to blind vendors and requires a justification for limitations on the placement or operation of vending facilities. They conclude that these two provisions, taken together, forbid the government from including criteria in contracts for vending services which blind vendors are unable to satisfy. Since blind vendors could not satisfy the requirement of national fast-food services, the plaintiffs argue that this requirement violated the Act.

This interpretation of section 107(b) is not without merit. Although Congress has failed to explain the scope of a "priority" or the nature of a "limitation," the language of that section is very expansive. Moreover, the language does not contain any terms which would restrict its apparent broad reach. A close examination of the legislative history of this section, the interplay between its statutory terms, and

an analysis of other statutory provisions of the Act, however, leads to the conclusion that the language of section 107(b) is not as generous as the plaintiffs would wish. In the absence of a clear congressional indication of the scope of section 107(b), the Court cannot adopt the sweeping interpretation which the plaintiffs advocate. Accordingly, the Court determines that the McDonald's and Burger King contracts do not violate the Act.

The starting point for the interpretation of section 107(b) is the language of its two relevant provisions: the priority established for blind vendors and the prohibition on any limitation on the placement or operation of vending facilities unless such a limitation is approved by the Secretary of Education. Although the plaintiffs focus on the limitation language, they apparently read the two provisions of the statute together to provide a broad set of rights for blind vendors.

A common sense reading of the statutory language, however, indicates that the failure to give priority to blind vendors is something different from imposing a limitation on the operation of their facilities. For instance, the government could afford a priority to a blind vendor over a nonblind competitor in operating a vending facility, but nevertheless, impose other limitations on the placement or operation of blind vending facilities. While the first action would meet the requirements of the Act, the second would not unless the prior approval of the Secretary of Education were obtained. Thus, it is reasonable to conclude that the failure to afford a priority to a blind vendor is not tantamount to imposing a limitation on vending operations.

Moreover, the statutory avenues of relief in the two situations differ. On the one hand, priority in "the operation of vending facilities on Federal property [ ] *shall* be given to blind persons licensed by a State agency...." 20 U.S.C. § 107(b) (emphasis added). The requirements of this section are unequivocal—blind persons have priority over nonblind persons in operating vending facilities on federal property. Of

course, the meaning of the term "priority" must still be examined.

On the other hand, the government is not absolutely prohibited from imposing limitations on the operation of vending facilities on federal property. If the government wishes to impose a limitation, it must show that the absence of such a limitation would "adversely affect the interests of the United States," and submit this justification to the Secretary of Education for approval. 20 U.S.C. § 107(b)(2). Thus, in considering the lawfulness of the government's actions in this case, the Court must consider whether the two procurements violated either of these statutory provisions. This requires an analysis of the two relevant terms: "priority" and "limitation."

**Priority**

The common sense meaning of a priority in the award of a government contract suggests that the two procurements in this case did not violate the Act. Ordinarily, the term "priority" means that an individual or organization seeking the award of a government contract should be given a preference if its proposal meets the requirements of the contract, and falls within a competitive range of the other bids. The term "priority" does not suggest an absolute right to receive a government contract, without regard to the contract criteria or the merits of the other bidders.

The sparse legislative history of section 107(b) suggests that this interpretation is correct. The language of the Senate report from the Committee on Labor and Public Welfare which accompanied the 1974 amendments to the Act, including section 107(b), stated that:

> [t]he insertion of the term "priority" underscores the Committee's expectation that where a vending facility is established on Federal property ... one or more blind vendors have a *prior right* to

do business on such property. (emphasis in original.)

Senate Report at 15. The report goes on to say that

> to the extent that a minority business enterprise or non-blind operated vending machine competes with or otherwise economically injures a blind vendor, every effort must be made to eliminate such competition or injury. (emphasis added.)

*Id.* These statements, taken together, indicate that with the exception of vending machines operated by nonblind persons and minority business enterprises, blind vendors are not insulated from competition. Nonblind vendors may compete with blind vendors for the opportunity to operate vending facilities on federal property. By analogy, the federal government may establish competitive criteria in soliciting contracts for fast-food procurements, and need not ensure that blind vendors are able to satisfy these criteria.

This interpretation is also supported by the section of the Act which specifically discusses the priority afforded blind vendors for the operation of cafeterias on federal property. *See* 20 U.S.C. § 107d–3(e). Cafeterias are one of several vending facilities enumerated in the Act. 20 U.S.C. § 107e(7). Although the parties apparently agree that a fast-food operation is not a cafeteria,[6] the following language in section 107d–3(e) is instructive:

> The Secretary, through the Commissioner, shall prescribe regulations to establish a priority for the operation of cafeterias on Federal property by blind licensees when he determines, on an individual basis and after consultation with the head of the appropriate installation, that such operation can be provided at a reasonable cost with food of a high quali-

---

**6.** According to the regulations

'Cafeteria' means a food dispensing facility capable of providing a broad variety of prepared foods and beverages (including hot meals) primarily through the use of a line where the customer serves himself from displayed selections. A cafeteria may be fully automatic or some limited waiter or waitress service may be available and provided within a cafeteria and table or booth seating facilities are always provided.

34 C.F.R. § 395.1(d). This description does not apply to fast-food restaurants.

ty comparable to that currently provided to employees, whether by contract or otherwise.

The regulation implementing this provision directs the government to promulgate certain requirements "[i]n order to establish the ability of blind vendors to [provide comparable cafeteria services] as that available from other providers of cafeteria services." 34 C.F.R. § 395.33(b). The government's solicitations for offers shall establish criteria under which all responses will be judged. Such criteria may include sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices. If the proposal received from the State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary.

*Id.* Thus, the government, in soliciting offers for contracts for vending facilities, may establish criteria by which those offers may be judged, and need only consider proposals from state licensing agencies which are within a competitive range.

By analogy, blind vendors who operate other types of vending facilities are not protected from all commercial competition, nor are they given the right to insist that the government's contract solicitations contain only terms and conditions which blind vendors can meet. There is no requirement that a bid proposal be tailored so that blind vendors could satisfy all of its criteria. This is particularly true in a situation such as this where the criteria complained of—the ability to operate a national fast-food operation—is unrelated to the condition of blindness. Instead, this requirement is apparently designed to incorporate certain efficiencies which can be achieved through economies of scale. Absent some clear indication from Congress that national procurements such as these are prohibited, the Court declines to enjoin these contracts.

**Limitation**

The plaintiffs also argue that the government may not insert a requirement in a proposal for a vending contract which blind vendors or state licensing agencies are not able to satisfy, unless that requirement has been cleared in advance by the Secretary of Education. Taken to an extreme, this argument amounts to an assertion that whenever a blind vendor is unable to meet the requirements of a solicitation for offers, that solicitation must be modified to permit the vendor to apply, or cleared in advance by the Secretary of Education. While Congress could certainly impose these stringent requirements on the ability of the government to determine how it conducts its business, a common sense interpretation of the language of 20 U.S.C. § 107(b)(2) and its legislative history suggests that Congress has not done so.

Section 107(b) requires the government to provide a justification for "any limitation on the placement or operation of a vending facility." Taken literally, this language would prohibit any nonblind person from operating a vending facility on federal property, since competition from other businesses would affect blind vendors. It is clear, however, that this language does not forbid all conceivable limitations on the operation of blind vending facilities. Such an interpretation would make nonsense out of Congress' obvious intent to permit both blind and nonblind vendors to conduct business on federal property. *See* discussion *supra* at 23; Senate Report at 19.

Given that certain limitations are not prohibited, the question is whether the procurements at issue fall between permissible boundaries. While neither the Senate report nor the hearings on the 1974 amendments purport to provide an exhaustive list of forbidden limitations, they serve as some indication of the types of restrictions which Congress sought to preclude. This legislative history indicates that impermissible limitations include restrictions

with respect to the kinds of merchandise a blind vendor was permitted to sell, with respect to the location of blind stand

[sic], or with respect to the amount of income permitted to accrue to a vendor. Senate Report at 16. This list of applicable limitations is repeated in several anecdotes contained in the report, *id.* at 10, 16, and in the Senate hearings. *See* Hearings Before the Subcommittee on the Handicapped, Committee on Labor and Public Welfare, ("Hearings"), 93d Cong., 1st Sess. at 97, 113, 126, 135, 138, 152, 154 (1973). The concern about the distribution of accrued income arose from the practice of some state agencies of limiting the income earned by any single blind vendor.

The proposals for the McDonald's and Burger King contracts do not appear to constitute this type of limitation on the operation of a vending facility. In contrast to the direct limitations catalogued in the Senate report, the requirements in the contract proposals have an indirect, albeit a significant, effect on the fortunes of blind vendors. As such, they are not proscribed by the Act.

The Court is sympathetic to the plaintiffs' real concerns with the government procurement practices at issue in this litigation. If the government continues to seek contracts with parties who have the ability to function on a national scale, the opportunity of blind vendors to compete for such contracts will be severely limited. The House Appropriations Committee recognized this fact, and directed the Department of Defense to "review its policies concerning contracting out for food service operations to determine if those policies comply with the Randolph-Sheppard Act." House Report at 24. The Committee also questioned the legality of the methods used by the Department in contracting for food service operations. But Congress has not taken any action to prohibit these practices, not has it issued a definitive statement on the scope of the Act, as it is empowered to do. At most, it has expressed concern about the concededly highhanded procedures utilized by the Department in contracting for food services. Under the present state of the law, the Court declines to hold the contracts invalid.

**CONCLUSION**

This Court has jurisdiction to consider the claim that these government procurements violate the Randolph-Sheppard Act. On the merits, the Court concludes that although the McDonald's and Burger King contracts deprive blind vendors of increased employment opportunities, the contracts do not fail to provide a priority for blind vendors or constitute a limitation on the placement or operation of blind vending facilities within the meaning of the Act. The complaints in these consolidated proceedings should be dismissed.

An appropriate Order in support of this Memorandum Opinion was filed on January 4, 1985.