**RANDOLPH–SHEPPARD VENDORS OF AMERICA, et al., Appellants,**

v.

**Caspar W. WEINBERGER, et al., Appellees.**

**NATIONAL COUNCIL OF STATE AGENCIES FOR THE BLIND, et al., Appellants,**

v.

**Caspar W. WEINBERGER, et al., Appellees.**

Nos. 85–5149, 85–5150.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1986.

Decided June 13, 1986.

As Amended July 30, 1986.

Robert R. Humphreys, Clinton, Ky., for appellants.

Joseph E. DiGenova, U.S.Atty., with whom Royce C. Lamberth, R. Craig Lawrence, and Rebecca L. Ross, Asst. U.S. Attys., Washington, D.C., were on brief, for federal appellees.

Stephen N. Shulman, with whom Barry S. Spector and E. Charles Rowan, Jr., Washington, D.C., were on brief, for appellee, McDonald's Corp.

Morgan D. Hodgson with whom Frank B. Stilwell III, Washington, D.C., was on brief, for amici curiae Association for the Education and Rehabilitation of the Blind and Visually Impaired and the Affiliated Leadership League of and for the Blind of America.

William C. Gleisner, III, with whom David L. Nichols and David E. Sunby, Milwaukee, Wis., were on brief, for amicus curiae National Federation of the Blind.

Before MIKVA and BORK, Circuit Judges, and OBERDORFER, District Judge.*

Opinion for the Court filed by District Judge OBERDORFER.

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

OBERDORFER, District Judge:

This appeal involves the proper interpretation of the Randolph-Sheppard Act (the Act), 20 U.S.C. §§ 107–107f (1982), which requires that blind persons licensed by state agencies be given priority to operate vending facilities on federal property. Some of the appellants are organizations which represent blind vendors. Specifically these organizations are the Randolph-Sheppard Vendors of America, the National Council of State Agencies for the Blind, the American Council of the Blind, and Blinded Veterans Association, Inc. Another appellant is the National Council of State Agencies for the Blind (National Council). In contrast to the associations with blind vendors as members, the National Council's membership consists of state agencies which license blind vendors to operate facilities on federal property. Finally, there are two individual appellants. These individuals are Paul Verner, a blind vendor and the President of Randolph-Sheppard Vendors of America, and Jennings Randolph, a retired United States Senator and the primary sponsor of the Act.[1] Appellants challenge two contracts awarded by the Secretary of Defense on the grounds that they were not made in accordance with the provisions of the Act. The first contract is to Burger King Corporation (Burger King) for the construction and operation of fast-food facilities on Army and Air Force bases. The second involves a similar contract award to McDonald's Corporation (Mc-

Donald's) for fast-food service on Naval bases. The challenges were originally separate actions, which were later consolidated by the District Court. Appellants brought suit against the Secretary of Defense, the Secretaries of the Army and Air Force, and certain Army and Air Force officials regarding the award of the Burger King contract, and against the Secretary of Defense, the Secretary of the Navy, and other Navy officials, regarding the award of the McDonald's contract. The Justice Department, acting as a neutral arbiter to resolve the differing stances of the Departments of Education and Defense, adopted the position of the Defense Department and opposed the complaints in the District Court and represents these individual appellees in this appeal.[2] McDonald's was a defendant-intervenor in the District Court. It has filed a brief as appellee in this appeal.

Appellants appeal from the Memorandum Opinion and Order of the United States District Court for the District of Columbia, which granted summary judgment to defendants. *Randolph-Sheppard Vendors of America v. Weinberger*, 602 F.Supp. 1007 (D.D.C.1985) (Parker, J.). As to jurisdictional and jurisprudential concerns raised by the government, the District Court found that the associational plaintiffs with blind vendors,[3] or state licensing agencies,[4] as members had standing to bring the action, and that these plaintiffs were not required to pursue and

1. Two groups were plaintiffs in the District Court and have filed an *amicus curiae* brief in this Court: the Affiliated Leadership League of and for the Blind of America, and the Association for the Education and Rehabilitation of the Blind and Visually Impaired. Another group, the National Federation of the Blind, was not a plaintiff in the District Court, but has filed an *amicus curiae* brief in this appeal.

2. According to the Justice Department, its position as neutral arbiter is justified by federal statute and executive order. The federal statute provides:

> Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefore, is reserved to officers of the Department

of Justice under the direction of the Attorney General.

28 U.S.C. § 516; *see* J.A. at 133. The executive order provides:

> Whenever two or more Executive agencies are unable to resolve a legal dispute between them, including the question of which has jurisdiction to administer a particular program or to regulate a particular activity, each agency is encouraged to submit the dispute to the Attorney General.

Exec.Order No. 12146, 44 Fed.Reg. 42,657, 42,-658 at ¶ 1–40 (1979).

3. These are the Randolph-Sheppard Vendors of America, the National Council of State Agencies for the Blind, the American Council of the Blind, and Blinded Veterans Association, Inc.

4. This is the National Council.

exhaust their administrative remedies under the Act. Reaching the merits, the District Court granted summary judgment to defendants, concluding that:

> [w]hile the Defense Department's apparent insensitivity to the plight of the blind vendors is deplored and there remain troublesome and vexing questions as to whether or not the Department has complied with the spirit of the law, the Court finds that the procurements complied with the minimum requirements of the letter of the Randolph-Sheppard Act.

602 F.Supp. at 1009.

For the reasons discussed below, we do not reach the merits because we conclude that while appellants had standing to sue, they failed to pursue and exhaust the mandatory administrative remedies. Accordingly, we vacate the judgment below and remand the case to the District Court with instructions to dismiss the action.

## I.

### A.

The Randolph-Sheppard Act was first enacted in 1936, and was amended twice, in 1954 and 1974. The purpose of the Act is to provide employment opportunities on federal property to blind vendors. S.Rep. No. 937, 93d Cong., 2d Sess. 5 (Sen. Report) (1974). The Act delegates to the Secretary of Education responsibility for interpreting and enforcing its provisions. The Commissioner of the Rehabilitative Services Administration, a subdivision of the Department of Education, is responsible for overseeing the detailed operation of the program. *Id.* at 3. The Act gives the Secretary responsibility for promulgating regulations to implement the Act. 20 U.S.C. § 107(b). Specifically, the Act directs the Secretary to prescribe regulations to assure that:

> (1) priority ... is given to ... licensed blind persons ..., and
>
> (2) wherever feasible, one or more [blind] vending facilities are established on all Federal property to the extent that any such facility or facilities would not ad-

versely affect the interests of the United States.

20 U.S.C. § 107(b)(2).

The Secretary also administers the two-tiered system whereby blind vendors may apply to operate a vending facility on Federal property. Under this system, the Secretary designates state licensing agencies. The state licensing agencies then license blind vendors. 20 U.S.C. § 107a(a)(5); 34 C.F.R. § 395.7. State licensing agencies apply to federal agencies for permits to establish sites for their licensed blind vendors on federal property. 20 U.S.C. § 107a(c); 34 C.F.R. §§ 395.16, 395.35.

A dispute resolution system established by the Act is similarly two-tiered, and operates under the auspices of the Secretary. This system provides, as to blind vendors and state licensing agencies, respectively:

> Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, ... If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute ..., and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.
>
> ....
>
> Whenever any State licensing agency determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this chapter or any regulations issued thereunder (including a limitation on the placement or operation of a vending facility ... and the Secretary's determination thereon) such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute ..., and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

20 U.S.C. § 107d–1(a), (b). State licensing agencies thus have responsibility for enforcing the substantive provisions of the Act. The Secretary's responsibility is then to oversee arbitration which interprets and applies the Act and the regulations promulgated thereunder. Specifically, it is the Secretary's responsibility upon the filing of a complaint by a blind vendor or state licensing agency to:

convene an ad hoc arbitration panel ... [which] shall ... give notice, conduct a hearing, and render its decision which shall be subject to appeal and review as a final agency action.

20 U.S.C. § 107d–2(a).

The substantive provisions of the Act place a number of obligations on federal agencies which maintain and control federal property. First, the Act provides:

Any limitation on the placement or operation of a [blind] vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary [of Education], who shall determine whether such limitation is justified.

20 U.S.C. § 107(b). The Act defines "vending facility" as:

automatic vending machines, cafeterias, snack bars, cart services, shelters, [and] counters.

20 U.S.C. § 107e(7).

Second, the Act requires that a newly acquired government building contain a satisfactory site for a blind vendor's facility or, if the new building is to be constructed or substantially altered, the plans for the construction or alteration include a satisfactory site for a blind vendor's facility. 20 U.S.C. § 107a(d)(1). This section also requires a federal agency to "provide notice to the appropriate State licensing agency of its plans for occupation, acquisition, renovation, or relocation of a building adequate to permit such State agency to determine whether such building includes a sat-

isfactory site or sites for a [blind] vending facility." *Id.*

A third section of the Act directs the Secretary of Education to promulgate regulations establishing a priority for blind persons in the awarding of contracts to operate cafeterias on federal property. 20 U.S.C. § 107d–3(e). The regulations promulgated by the Secretary require that any government agency soliciting competitive bids for a cafeteria contract award it to a state agency representing blind persons if the state agency's proposal is for service that "can be provided at a reasonable cost, with a food of a high quality comparable to that currently provided employees." 34 C.F.R. § 395.33(d). Under the regulations, "the appropriate State licensing agency shall be invited to respond to solicitations for offers when a cafeteria contract is contemplated." 34 C.F.R. § 395.33(b). The regulations define a "cafeteria" as:

a food dispensing facility capable of providing a broad variety of prepared foods and beverages (including hot meals) primarily through the use of a line where the customer serves himself from displayed selections. A cafeteria may be fully automatic or some limited waiter or waitress service may be available and provided within a cafeteria and table or booth seating facilities are always provided.

34 C.F.R. § 395.1(d).[5]

**B.**

Events leading to the filing of this action commenced on April 2, 1984, when the Army and Air Force Exchange Service solicited bids to establish franchised "fast food (specializing in hamburgers) facilities" on selected Army and Air Force bases worldwide. Joint Exhibit (J.A.) at 129 (filed April 25, 1985); Brief for Federal Appellees (Brief for Federal Appellees) at 3 (filed June 20, 1985). On June 5, 1984, the Navy Resale and Services Support Office solicited bids for "nationally recognized

---

**5.** A fourth requirement of the Act, not at issue in this litigation, regards vending machine income. 20 U.S.C. § 107d–3.

fast food hamburger organizations" to place their facilities on Naval Bases in the United States and abroad. *Id.* On May 15, 1984, the Army and Air Force Exchange Service awarded its contract to Burger King. On August 7, 1984, the Navy signed its contract with McDonald's.[6] The Burger King contract authorizes the construction of as many as 185 franchised facilities during the five years after the contract award, twenty-four of which were to have been completed during 1985. The McDonald's contract calls for the construction and operation of a minimum of forty and a maximum of three hundred fast-food facilities. 602 F.Supp. at 1010.

Upon learning of the bid solicitations, appellants expressed their concern to the Secretary of Defense that if his departments awarded the contracts as planned, without complying with the provisions of the Act, "the Defense Department would be acting, or taking steps to act, in violation of the requirements of the Randolph-Sheppard Act". J.A. at 45 (Letter of Senator Randolph to Secretary of Defense Weinberger (June 27, 1984)). Specifically, the Defense Department had never submitted any element of either bid solicitation to the Secretary of Education for a determination as to whether the requirement that bidders provide nationwide fast-food service constituted a "limitation on the placement or operation of a blind vending facility" under 20 U.S.C. § 107(b). 602 F.Supp. at 1011. Nor had the Defense Department complied with 34 C.F.R. § 395.33, which requires that state licensing agencies be notified of, and blind persons receive priority in, competitive solicitations for cafeteria contracts. The Defense Department also had not consulted with the Secretary of Education to determine whether any state licensing agencies would be able to provide the type of food service contemplated, J.A. at 52 (Letter from Assistant Secretary for Special Education and Rehabilitative Services Will to Senator Randolph (Oct. 31, 1984)), thus potentially

denying to blind vendors the opportunity to apply for a "priority" under the Act. 20 U.S.C. § 107(b). There is also no indication in the record that the Defense Department, pursuant to 20 U.S.C. § 107a(d)(1), notified state licensing agencies of its plan to acquire or renovate buildings to accommodate the fast-food facilities.

The Secretary of Defense responded to appellants' concerns as follows:

It has recently become clear that there is a strong demand by military families for the products of the leading national fast-food chains. As a result the military exchanges are making arrangements to provide these brand-name food items (e.g., McDonald's and Burger King) on either a direct franchise basis or pursuant to a concession contract....

The Department of Education recently confirmed our understanding that, to their knowledge, none of the state licensing agencies are presently in a position to provide these nationally franchised items.

The Department of Defense fully and actively supports the Randolph-Sheppard program. We have claimed no exemption from the Randolph-Sheppard Act in conjunction with providing nationally known fast-food service.

J.A. at 47 (Letter from Secretary of Defense Weinberger to Senator Randolph (July 30, 1984)).

A number of Department of Education officials also expressed concern over the implications of the awards of the fast-food contracts under the Act. In a letter to one of the appellants, one of these individuals stated:

The Department has taken the position that the issuance of a request for proposal by a Federal entity which restricts applications only to fast-food concerns capable of operating in numerous States appears to impose a limitation on the

---

**6.** The McDonald's contract provides for franchised fast-food facilities. Under the Burger King contract, the Army and Air Force will operate the facilities directly, using their own buildings, supplies, equipment and personnel. Brief for Federal Appellees at 3–4.

placement of Randolph-Sheppard vending facilities.

J.A. at 48–49 (Letter from Commissioner for Special Education and Rehabilitative Services Conn to Director of Governmental Affairs Marshall (Sept. 13, 1984)). The Secretary of Education wrote to the Secretary of Defense to express his concern that the bid solicitations "may have failed to afford blind vendors an opportunity to be considered for the priority envisioned for them in the Act," J.A. at 50 (Letter from Secretary of Education Bell to Secretary of Defense Weinberger (Oct. 26, 1984)), and that:

> the multi-State requirements of the [bid solicitations] at issue may constitute a limitation on the placement or operation of a Randolph-Sheppard facility that, under 20 U.S.C. 107(b), must be cleared in advance by the Secretary of Education. It is my understanding that those requirements were not submitted for clearance.

J.A. at 51. Finally, a letter from another Department of Education official contradicted the Secretary of Defense's representation that the Department of Education had verified that blind vendors lacked the ability to bid on the contracts at issue. Her letter stated that:

> the Department of Education has made no determination about the ability of any State Licensing Agency to provide nationally franchised food items nor has the Department of Education approved a limitation under Section 1(b) of the Randolph-Sheppard Act or the associated regulations at 34 CFR 395.30(b) concerning the operation of cafeterias by blind vendors on Department of Defense property. Since no determinations have been made, the understanding of the Department of Education's position which Secretary Weinberger expresses in paragraph four of his July 30 letter is inaccurate. This misunderstanding might have been based on out of context conversations among lower level officials.

J.A. at 52 (Letter from Assistant Secretary for Special Education and Rehabilitative Services Will to Senator Randolph (Oct. 31, 1984)).

In addition to the statements by the Department of Education officials, the House Appropriations Committee concluded in September, 1984 that:

> [i]nformation provided to the Committee indicates that the methods used by the Department in contracting for [the McDonald's] food service operation circumvented, if not the letter of the law, at least the spirit of the law.

H.Rep. No. 1086, 98th Cong., 2d Sess. 24 (1984). The Committee directed the Department of Defense to "review its policies concerning contracting out for food service to determine if those policies comply with the Randolph-Sheppard Act." *Id.* The Committee further required the Defense Department to "determine if every opportunity was given to the state licensing agents who represent blind vendors to bid for these contracts," and to file a report addressing these issues with the Committee before March 1, 1985. *Id.* Previously, in addressing the need for "strengthening of the [Randolph-Sheppard] program" through the 1974 amendments to the Act, the Senate Committee reviewing the proposed legislation had noted that "[c]ommanders of military installations are singularly insensitive to the need to develop the [Randolph-Sheppard] program." Sen. Report at 10.

### C.

After the signing of the McDonald's contract, appellants filed a bid protest with the General Accounting Office, which dismissed the protest on the basis that it had no jurisdiction over nonappropriated fund activity. J.A. at 130. No appellant sought arbitration under the Act. Instead, appellants filed complaints in federal District Court challenging both contract awards. Appellants sought a preliminary injunction pending resolution by the District Court on the merits. The District Court deemed resolution of the preliminary injunction issue unnecessary because the government agreed to stay further construction on

most of the fast-food sites pending an expedited judicial decision on the merits. 602 F.Supp. at 1009.

In its Memorandum Opinion, the District Court first addressed the question of standing. The District Court found that the two individual plaintiffs, Senator Jennings Randolph, the sponsor of the Act, and Paul Vernor, a licensed blind vendor and President of the Randolph-Sheppard Vendors, lacked standing. According to the District Court, Senator Randolph's interest was only "in the proper execution of the law," and "amounts to a generalized grievance which is too intangible to confer standing." 602 F.Supp. at 1013 (citation omitted). The District Court also found the individual Paul Vernor to lack standing. The Court noted that although Vernor is a blind vendor who operates a cafeteria in Tampa, Florida, he had failed to allege specific injury, such as that he desires to run a fast-food operation or that his cafeteria business would be harmed by construction of a McDonald's or Burger King. Id.

As to the associational plaintiffs, the District Court found that those plaintiff associations which had blind vendors as members [7] had standing based on affidavits indicating that blind vendors would provide fast-food services to the Department of Defense if they were contracted for on a smaller scale. Id. at 1014. The District Court also noted that the affidavit submitted by one organization from a blind vendor member who alleged that he would request an opportunity to operate a fast-food facility in Illinois if the state licensing agency had been able to bid for operations at an Illinois location strengthened that organization's standing claim. Id.

As to the National Council, a membership organization of state licensing agencies, the District Court noted that state licensing agencies are responsible under the Act for obtaining employment for the blind vendors on federal property. The Court then found that the inclusion of a requirement in the bid solicitation that the bidder have the capacity to provide nationwide fast-food service constituted "a perceptible and specific injury to the state agencies and the blind vendors they supervise." Id. at 1014 (citation omitted). The District Court thus found the same affidavits which established injury to the blind vendors to establish injury to the state licensing agencies and their representative organization, the National Council. The District Court found the claims of two groups which train blind persons for employment [8] to be too attenuated to establish standing. Id.

On the issue of exhaustion, the Court recognized that "[i]t is unquestionable that at least one affected group—the state licensing agencies—could have sought administrative review of the procurement decisions by seeking arbitration from the Department of Education." Id. at 1015. The Court noted an apparent split of authority on whether arbitration under the Act is mandatory or permissive, but found it unnecessary to decide the issue because it found that arbitration would be futile. According to the Court, "The rights which the plaintiffs seek to vindicate would be lost in the absence of a speedy ruling, even if the Court were to rule in their favor on the merits. Thus, the pragmatic considerations of this case preclude the application of any arbitration requirement." Id. at 1015.

On the merits, the District Court construed the meaning of the terms "priority" and "limitation" under the Act. 20 U.S.C. § 107(b). After analyzing the statutory language, the District Court concluded that "[t]he term 'priority' does not suggest an absolute right to receive a government contract, without regard to the contract criteria or the merits of the other bidders." Id. at 1017. The District Court thus found that the requirement in the Act that blind

---

7. These are the Randolph-Sheppard Vendors of America, the National Council of State Agencies for the Blind, the American Council of the Blind, and Blinded Veterans Association, Inc.

8. These are the Affiliated Leadership League of and for the Blind of America, and the Association for the Education and Rehabilitation of the Blind and Visually Impaired.

vendors receive a priority on federal property does not preclude the government from including conditions in its food service bid proposals which blind vendors cannot meet. The District Court then examined the term "limitation," and found that the bid solicitation provisions at issue did not constitute a "limitation on the placement or operation of a vending facility" so as to require the Defense Department to seek prior approval from the Secretary of Education. 20 U.S.C. § 107(b). The District Court noted that it was "sympathetic to the plaintiffs' real concerns with the government procurement practices at issue in this litigation," but concluded that "[u]nder the present state of the law, the Court declines to hold the contracts invalid." 602 F.Supp. at 1019.

### D.

In this appeal, appellants claim that the District Court failed to recognize that the Defense Department's activities surrounding the contract awards to the fast-food chains violated four provisions of the Randolph-Sheppard Act: (1) that priority be accorded to blind vendors in operating vending facilities on federal property, 20 U.S.C. § 107(b);[9] (2) that any limitation by a federal agency on the placement or operation of a blind vending facility be submitted for determination by the Secretary

of Education, 20 U.S.C. § 107(b); (3) that all new or renovated buildings on federal property include a site for a blind vending facility, 20 U.S.C. § 107a(d)(1);[10] and (4) that appropriate State licensing agencies be notified when a building is acquired or renovated for the purpose of placing one or more blind vendors at a satisfactory site in the building. Id.; Brief for Appellants (Brief for Appellants) at 11 (filed April 25, 1985). Appellants also contest the role played by the Justice Department as arbiter between the Defense Department and the Department of Education. Appellants claim that both the Justice Department and the District Court failed to recognize the primacy given by Congress to the Department of Education in interpreting the Act. Finally, appellants claim that the District Court erroneously denied the two individual plaintiffs standing.

Appellees argue that appellants lack standing to bring this action because they have alleged no actual injury as a result of the contract awards at issue. Appellees also claim that because appellants have failed to follow the arbitration scheme established by the Act, their claims should not yet be reviewed in federal court. Appellees then support the District Court's decision on the merits arguing that the fast-food contracts at issue fall outside the Act and thus do not violate its provisions.[11]

9. Appellants claim first that the fast-food facilities should be considered "cafeterias" under the Act and thus be subject to the strict priority provisions of 34 C.F.R. § 395.33. Appellants primarily argue, however, that even if the fast-food facilities do not constitute "cafeterias" under the Act, they are "vending facilities" and for this reason the Defense Department bid solicitations and contracts violate the other provisions of the Act.

10. This claim was not raised in the District Court and thus will not be considered in this appeal.

11. Appellee McDonald's argues extensively that its fast-food facilities do not fall within the definition of "vending facility" under the Act. The grounds for this argument of McDonald's is not the range of food served, since in addition to the more limited "snack bars, cart services, shelters, [and] counters," 20 U.S.C. § 107e(7), "vending facility" includes "cafeterias" which serve "a

broad variety of prepared foods and beverages." 34 C.F.R. § 395.1(d). McDonald's distinguishes its facilities from those covered by the Act on the basis of the volume and complexity of the food service. According to appellee:

In contrast to a stand, counter, snack bar, or even a cafeteria, a fast-food restaurant is far more complex and serves a much greater number of customers. Unlike the listed facilities, a fast-food restaurant is designed for very high turnover, requiring, among other things, close management control of food production to minimize the "throw-away" factor. A fast-food hamburger restaurant is also a much larger, more expensive operation. Whereas the listed facilities are of a type suitable to serve a portion of the employee population of a federal building, a McDonald's restaurant is suited to serve the population at large in an entire community.

. . . .

... There can be little doubt that Congress intended that the vending facilities operated

They also claim that the Justice Department properly resolved the litigation dispute between the two government agencies in this matter.

## II.

### A.

■■■ Before reaching the merits of the controversy, we must resolve the serious jurisdictional and jurisprudential questions raised here and in the District Court.[12] The District Court found the National Council to have standing as a representative of the state agencies, and the other associational plaintiffs to have standing on behalf of their blind vendor members. Appellees assert, correctly, that an association's standing depends upon a showing that its members would have standing to sue in their own right. *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). They then argue that no individual blind vendor or state agency would have standing because none has alleged a "concrete, perceptible harm of a real, non-speculative nature." *North Carolina Utilities Commission v. Federal Energy Regulatory Commission,* 653 F.2d 655, 662 (D.C.Cir.1981) (quoting *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 716 (D.C.Cir.1977)). They claim that to show such a perceptible harm, a blind vendor, or a state licensing agency on the blind vendor's behalf, must have applied for, and been denied, a permit to operate a vending facility on a military base because of the contract awards at issue. But, along with the claims that blind vendors were not

granted the necessary priority under the Act is the claim that the Defense Department failed to notify state licensing agencies of newly acquired or renovated buildings as is required under the Act. 20 U.S.C. § 107a(d)(1). Standing as to this issue does not depend on a showing that blind vendors, through a state licensing agency, applied for, and did not receive, a permit to operate a vending facility on a military base. The lack of notice alone constitutes a concrete injury under the Act which a state licensing agency would have standing to challenge. The National Council is an organization formed to protect the collective rights of state licensing agencies, and there is no indication that participation of individual state licensing agency members is required to adjudicate the notice issue. Thus, the National Council in its representational capacity has standing to protect the rights of its members under the Act. *Hunt, supra,* 432 U.S. at 343, 97 S.Ct. at 2441.

As to the claims that the contract awards deny blind vendors a "priority" and constitute a "limitation on the placement or operation of a vending facility" in contravention of the Act, 20 U.S.C. § 107(b), at least the appellant organizations with blind vendors as members [13] have standing to contest the awards. Appellants claim that the "priority" afforded blind vendors in the Act requires that blind vendors be "insulated from competition." Brief for Appellants at 19–20. Under this interpretation of the Act, blind vendors have standing to argue that the fast-food facilities would injure them by competing with existing blind vendors in violation of the Act. *See* J.A. at 77–78 (Affidavit of Donald H. Wedewer at

---

by blind vendors would not include expensive, complex, high turnover, fast-food restaurants.
Brief for Appellee, McDonald's Corporation at 16–18 (filed June 5, 1985) (footnotes omitted).

**12.** Both the issues of joinder and exhaustion as presented in this action are jurisprudential concerns. *See Ilan-Gat Engineers, Ltd. v. Antigua International Bank,* 659 F.2d 234, 240 (D.C.Cir. 1981) (joinder); *I.A.M. National Pension Fund Benefit Plan C v. Stockton Tri Industries,* 727

F.2d 1204, 1208 (D.C.Cir.1984) ("Only when Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision ... has the Supreme Court held that exhaustion is a jurisdictional prerequisite.").

**13.** These are the Randolph-Sheppard Vendors of America, the National Council of State Agencies for the Blind, the American Council of the Blind, and Blinded Veterans Association, Inc.

¶¶ 5–7); J.A. at 81 (Affidavit of Richard Weidow at ¶ 5). Because blind vendors would have standing to sue in their own right, those organizations with blind vendors as members have standing as their representatives to contest the contract awards. *Hunt, supra,* 432 at 343, 97 S.Ct. at 2441; *Warth, supra,* 422 U.S. at 511, 95 S.Ct. at 2211. Accordingly, we find that at least some appellants have standing to pursue this action.[14] We find no need to pursue the question of standing further because we rest our decision to dismiss this action on other grounds.

**B.**

In this case, no party pursued the grievance procedure set out in the Act. In fact, no state agency, the only entity which can seek arbitration over a perceived violation of the Act by a federal agency, 20 U.S.C. § 107d–1(b), was even a plaintiff in the action. Consequently after oral argument on the appeal, we ordered the parties to file supplemental briefs on the following questions:

1. Is joinder of a state licensing agency, 20 U.S.C. § 107(b) (1982), needed for just adjudication of this case?

2. Assuming joinder of a state licensing agency is needed but not feasible, should the action be dismissed?

**14.** The Act places responsibility for seeking arbitration as to violations of the Act, including limitations on the placement or operation of blind vending facilities, with state licensing agencies. 20 U.S.C. § 107d–1(b). After arbitration, a state licensing agency would have standing to seek judicial review of the arbitral decision. 20 U.S.C. § 107d–2(a). Because of the statutory responsibility of state licensing agencies to enforce the rights of their blind licensees, the National Council, as representative of state licensing agencies, may also have standing to argue that the Defense Department's actions violate the substantive provisions of the Act.

**15.** Three parties responded to the supplemental order: appellants, and both appellees, the government and McDonald's.

**16.** According to the government:
[T]o the extent that this Court is reviewing the purely legal question of whether the contract provisions constitute a limitation on the operation or placement of a vending facility, the SLAs' [state licensing agencies'] interest would

Order (filed Jan. 23, 1986). No party[15] argues that the action should be dismissed for failure to join a state licensing agency. The parties claim that the appellant National Council adequately represents the interests of its state licensing agency members.[16] We find that absent joinder of a state licensing agency complete relief can be afforded all parties to this action, and that the nonjoinder of a state licensing agency will not result in prejudice to any party to this action or any nonparty state licensing agency. *See* 7 C. Wright & A. Miller, *Federal Practice and Procedure* p. 90 (1972); *Ilan-Gat Engineers, Ltd., supra,* 659 F.2d at 240–41. We thus decline to dismiss the action on nonjoinder grounds.

**C.**

We now address the dispositive issue of exhaustion. In its analysis of the exhaustion requirement, the District Court noted "several difficult questions of interpretation," 602 F.Supp. at 1015, including the question of whether resort to arbitration is mandatory under the Act. The District Court compared several federal court decisions finding arbitration under the Act to be mandatory, *Fillinger v. Cleveland Society for the Blind,* 587 F.2d 336 (6th Cir. 1978), *reh'g denied,* 591 F.2d 378 (6th Cir.

be protected. And, since the SLAs are the only entity to be able to challenge a limitation through arbitration, the government would not be subject to inconsistent obligations because SLAs (in privity with the National Council) would be bound by the determination reached in this case.
Supplemental Brief for Federal Appellees at 9 (filed Feb. 5, 1986) (footnotes omitted). Appellees continue to claim, however, that the District Court should not have found the National Council to have standing, because no member state agency could demonstrate that it applied to place a blind vendor and was rejected because of one of the contracts at issue. *Id.* at 13 ("[T]he 'problem' in this case is the lack of sufficient allegations of harm, not the failure to join a necessary party."). Absent standing, argue appellees, the Court should not reach the question of joinder. *Coast v. Hunt Oil Co.,* 195 F.2d 870, 872 (5th Cir.), *cert. denied,* 344 U.S. 836, 73 S.Ct. 46, 97 L.Ed. 651 (1952).

1979); *Massachusetts Elected Committee of Blind Vendors v. Matava*, 482 F.Supp. 1186 (D.Mass.1980), with a Claims Court decision finding such arbitration not to be required. *Texas State Commission for the Blind v. United States*, 6 Cl.Ct. 730, 735 n. 12 (Ct.Cl.1984).[17] The District Court determined, however, that it "need not consider the precise scope of the arbitration requirement," because "any resort to arbitration would have been futile." 602

F.Supp. at 1015. The sole basis for this finding of futility was that "an arbitration procedure under the Act would require considerable time to complete," approximately one and one-half years, *id.* at 1015 & n. 5, and plaintiffs' rights would be lost in the absence of a speedy ruling.

i.

We first examine the scope of the arbitration requirement.[18] In establishing the

---

**17.** The District Court also cited *Randolph-Sheppard Vendors of America, Inc. v. Harris*, 628 F.2d 1364 (D.C.Cir.1980), noting that:

[t]here, the court was well aware of the internal arbitration procedures, *id.* at 1368, but did not find that these procedures presented any bar to federal jurisdiction. Thus, it is at least arguable that certain broad challenges to the implementation of the Act are not proper subjects for arbitration.

602 F.Supp. at 1015. The "broad challenge" in *Harris*, however, was to the regulations promulgated by the Secretary of the Department of Health, Education and Welfare (now the Department of Education) pursuant to the Act. The challenge did not relate to the "operation or administration of the vending facility program," 20 U.S.C. § 107d–1(a), nor to contested actions of federal entities with "control of ... Federal property," 20 U.S.C. § 107d–1(b). Instead, the challenge related to the actual structure of the program as established by the regulations promulgated by the Secretary. Agency rulemaking pursuant to its authority under a statute, in contrast to an allegation that another agency has failed to abide by the provisions of statute, does not require further agency action to be "final," but is directly reviewable under the Administrative Procedure Act as "agency action." 5 U.S.C. § 706(2).

**18.** The arbitration process at issue in this action is established by federal statute and committed to a federal agency. We thus analyze the arbitration requirement under administrative law principles. *See generally Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). A separate, but analogous, inquiry obtains where arbitration as a dispute resolution process is agreed to by parties to a contract. The "federal courts have recognized a strong federal policy in favor of voluntary commercial arbitration." *Hanes Corp. v. Millard*, 531 F.2d 585 (D.C.Cir.1976); *see Schattner v. Girard, Inc.*, 668 F.2d 1366, 1369 (D.C.Cir.1981). In fact, this policy is embodied in the United States Arbitration Act, 9 U.S.C. §§ 1–208 (1982), which provides that agreements to arbitrate a commercial dispute "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.

§ 2. The policy of the Arbitration Act is that agreements to arbitrate should be liberally construed, with all doubts resolved in favor of arbitration. *Moses H. Cone Memorial Hospital v. Mercury Construction Co.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983); *Schattner, supra*, 668 F.2d at 1369; *Hanes Corp., supra*, 531 F.2d at 597.

The "strong federal policy" in the commercial contract context is analogous to the "long settled rule" in the administrative context that parties must exhaust their administrative remedies before being heard in federal court. *See Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938). As when there exists a prescribed administrative procedure, when a court is confronted with an issue which the parties agreed by contract to arbitrate, "[t]he propriety [of judicial intervention] must be judged with reference to whether the issue in question is more properly resolved in another forum." *Hanes Corp., supra*, 531 F.2d at 596 (citing *Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 246, 73 S.Ct. 236, 241, 97 L.Ed. 291 (1952) (judiciary should not "pre-empt and prejudge issues that are committed for initial decision to an administrative body or special tribunal.")).

Despite the similarities between the policies in the commercial contract, and administrative law, contexts, they differ in some respects. The inquiry when a court is confronted with a contractual arbitral process revolves around the parties' intent. Where arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America*, —— U.S. ——, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)). Thus, the "threshold question" of the arbitrability of a particular issue is for judicial determination. *AT & T Technologies, Inc., supra*, 106 S.Ct. at 1419 (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546, 84 S.Ct. 909, 912, 11 L.Ed.2d 878 (1964)). In determining whether a particular dispute is arbitrable, a court must determine whether the parties intended the particular dis-

grievance and arbitration procedure, the Senate Committee reviewing the 1974 amendments to the Act stated that "[i]t is the expectation of the Committee that the arbitration and review procedures adopted ... will provide the means by which aggrieved vendors and State agencies may obtain final and satisfactory resolution of disputes." Sen. Report at 20. The Act provides that "[*a*]*ny* blind licensee who is dissatisfied with *any* action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing." 20 U.S.C. § 107d–1(a) (emphasis added). The Act then specifically conditions resort to the Secretary on initial action by the state licensing agency, stating that "[i]f such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing [at the state agency level], he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute...." *Id.* The statutory language regarding state licensing agencies is equally explicit, providing that "[*w*]*henever* any State licensing

agency determines that any [federal agency] ... is failing to comply with the provisions of this chapter or any regulations issued thereunder ... such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute...." 20 U.S.C. § 107d–1(b) (emphasis added).[19] For both a blind licensee and a state agency, an arbitration decision is "final and binding on the parties except as otherwise provided in [the Act]." 20 U.S.C. §§ 107d–1(a), (b). Finally, the Act provides for judicial review of the arbitration decision after "final agency action." 20 U.S.C. § 107d–2(a).

■ The Act thus establishes a clear and explicit system for resolution of disputes arising under the Act. This dispute resolution system parallels the tiers of authority established by the Act. Under the substantive provisions of the Act, a blind person must apply for a license from a state agency. The state agency then applies to a federal agency for placement of the licensee. Similarly, under the dispute resolution scheme, a blind licensee must first

---

pute to be covered by the arbitration clause and if so, whether there is any reason why the parties' agreement should not be given legal force. *Hanes Corp., supra,* 531 F.2d at 598. In contrast to an inquiry into the parties' intent, when a court is confronted with an administrative process established by statute, the inquiry concerns *congressional* intent, *see Citizens to Preserve Overton Park, Inc., supra,* 401 U.S. at 412, 91 S.Ct. at 821, and whether there is any equitable reason why the congressional intent should not be enforced in the particular circumstances. *See, e.g., Committee for GI Rights v. Callaway,* 518 F.2d 466 (D.C.Cir.1975). Nevertheless, the result of a judicial determination that either the parties to a dispute, or Congress, intended to commit resolution of a dispute to another forum, and that there are no unusual circumstances which preclude enforcement of the evident intent, is the same—the court defers to the arbitral or administrative process. *Compare Schattner, supra,* 668 F.2d at 1369; *Hanes Corp., supra,* 531 F.2d at 597–98 *with McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969); *Myers, supra,* 303 U.S. at 50–51, 58 S.Ct. at 463–64.

19. The sections of the Act which set out the dispute resolution process for both blind vendors and state licensing agencies use the word "may" as opposed the word "shall." 20 U.S.C.

§ 107d–1(a), (b) ("Any blind licensee ... *may* submit ... a request for a full evidentiary hearing ...;" "any ... licensing agency *may* file a complaint with the Secretary....") (emphasis added). "Shall" is normally the language of command in a statute, *Association of American Railroads v. Costle,* 562 F.2d 1310, 1312 (D.C.Cir. 1977); *Boyden v. Commissioner of Patents,* 441 F.2d 1041, 1043 (D.C.Cir.), *cert. denied,* 404 U.S. 842, 92 S.Ct. 139, 30 L.Ed.2d 77 (1971), whereas "may" is ordinarily construed as permissive. *Haig v. Agee,* 453 U.S. 280, 294 n. 26, 101 S.Ct. 2766, 2775 n. 26, 69 L.Ed.2d 640 (1981); *Thompson v. Clifford,* 408 F.2d 154, 158 (D.C.Cir.1968). This construction of the word "may" as discretionary, however, "is by no means invariable, ... and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." *United States v. Rodgers,* 461 U.S. 677, 706, 103 S.Ct. 2132, 2149, 76 L.Ed.2d 236 (1983) (citations omitted); *see Thompson, supra,* 408 F.2d at 158 (conclusion of discretion depends "on the context of the statute.") (quoting *United States ex rel. Siegel v. Thoman,* 156 U.S. 353, 359, 15 S.Ct. 378, 380, 39 L.Ed. 450 (1895)). Here we find that the purpose and context of the statute defeats any inference of general discretion to be garnered from Congress' use of the word "may," subject, of course, to the exceptions discussed below. *See* Part II, C, ii.

apply to the state licensing agency before filing a complaint with the Secretary. As under the substantive provisions of the Act, a state licensing agency has direct resort to the Secretary under the dispute resolution system. Most telling as to Congress' intent, however, is its statement that an arbitration decision "shall be subject to appeal and review as a final agency action." 20 U.S.C. § 107d–2(a). In contrast to *de novo* review, judicial review of final agency action is "severely circumscribed," requiring a reviewing court to determine whether a decision is within the ambit of the agency's discretion and supported by the record. *Process Gas Consumers Group v. U.S. Department of Agriculture,* 694 F.2d 728, 740 (D.C.Cir.1981), *cert. denied,* 461 U.S. 905, 103 S.Ct. 1874, 76 L.Ed.2d 807 (1983); *see Citizens to Preserve Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. at 824 ("[T]he ultimate standard of review is a narrow one.").[20] It is unlikely, after establishing a specific dispute resolution system and conditioning judicial review on a final agency action, that Congress contemplated that an aggrieved party could, whenever it chose, circumvent the system and seek *de novo* determination in federal court. Surely Congress contemplated that disputes between state agencies and government agencies could involve contract awards, such as the one at issue here. Congress nevertheless set up an arbitration scheme instead of authorizing direct resort to federal court. As Justice Brandeis stated the "well settled" rule: "where a statute creates a right and provides a special remedy, that remedy is exclusive." *United States v. Babcock,* 250 U.S. 328, 331, 39 S.Ct. 464, 465, 63 L.Ed. 1011 (1919) (citations omitted). Thus, where Congress has created an arbitration scheme as the administrative method for enforcing a statutory right, there is a strong presumption that it is exclusive.

Other courts that have examined the issue have found that Congress intended to make arbitration under the Act mandatory. According to the Court of Appeals for the Sixth Circuit:

> Congress' decision to provide administrative and arbitration remedies for aggrieved blind vendors clearly evidences a policy judgment that the federal courts should not be the tribunal of first resort for the resolution of such grievances. Rather congressional policy as reflected in the 1974 amendments is that blind vendors must exhaust their administrative and arbitration remedies before seeking review in the district courts.

*Fillinger, supra,* 587 F.2d at 338; *see Matava, supra,* 482 F.Supp. at 1189 ("The conclusion reached by the Sixth Circuit in *Fillinger* is a sound one."). *But see Texas State Commission, supra,* 6 Cl. Ct. at 735 n. 12.[21] Moreover, in an earlier decision,

---

**20.** A court may look more closely at an agency's interpretation of substantive provisions of its statutory mandate, but even in this analysis deference is due the agency's decision. *United Steelworkers of America, AFL–CIO–CLC v. Marshall,* 647 F.2d 1189, 1206 (D.C.Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); *Thompson, supra,* 408 F.2d at 166–67.

**21.** The Claims Court in *Texas State Commission* found that "[a]rbitration under the Randolph-Sheppard Act is voluntary." 6 Cl.Ct. at 735 n. 12. After quoting the language of the Act, the Claims Court concluded that:

> [i]n comparing the permissive language allowing an arbitration request with the mandatory language requiring arbitration only after such a request, it becomes clear arbitration is not mandatory.

*Id.*

The Claims Court cited one case in support of its result, *Oklahoma ex rel. Department of Human Services v. Weinberger,* 582 F.Supp. 293 (W.D.Okla.1982), *aff'd,* 741 F.2d 290 (10th Cir. 1983), and three cases where an opposite result was reached, two of which were *Fillinger, supra,* and *Matava, supra,* and the other of which was an unpublished district court decision. *Texas State Commission for the Blind,* Civil Action No. A–84–CA 214 (W.D.Tex. Sept. 28, 1984). The Claims Court addressed the federal court decisions which reached the opposite result as follows:

> The decisions in other jurisdictions requiring prior arbitration are not persuasive. In *Texas* the court stated arbitration was mandatory and provided no reasoning for its decision. In *Fillinger* the court reasoned the amendments to the Randolph-Sheppard Act allowing arbitration reflected a congressional policy "that blind vendors must exhaust their administrative and arbitration remedies be-

we indicated that we would be inclined to adopt this view. In *Harris, supra,* we noted that the Act and the regulations promulgated thereunder "set up an internal arbitration procedure for dispute resolution, culminating in judicial review of final agency action." 682 F.2d at 1368. It is a "long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers, supra,* 303 U.S. at 50–51, 58 S.Ct. at 463–464 (footnote omitted); *see McKart, supra,* 395 U.S. at 193, 89 S.Ct. at 1662. Moreover, the policy of exhaustion "is particularly viable where an established scheme of decision making might be undermined by permitting circumvention of administrative procedures." *Wallace v. Lynn,* 507 F.2d 1186, 1190 (D.C. Cir.1974). Here, the Act establishes a statutory scheme for enforcing statutory rights. The "long settled rule of judicial administration," *Myers, supra,* 303 U.S. at 50, 58 S.Ct. at 463, should therefore apply. Absent a cognizable rationale for failing to pursue arbitration under the Act, appellants' action must be dismissed for failure to exhaust their administrative remedies.

### ii.

Despite the general rule that exhaustion of administrative remedies is a predicate to judicial review, *id.,* courts have developed exceptions to the exhaustion requirement in circumstances where "the reasons supporting the doctrine are found inapplicable." *Committee for GI Rights, supra,* 518 F.2d at 474; *see Atlantic Richfield Co. v. U.S. Department of Energy,* 769 F.2d 771, 781–82 (D.C.Cir.1984); *Association of National Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1156 (D.C.Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980), *modified on other grounds, Telecommunications Research & Action Center v. FCC,* 750 F.2d 70 (D.C. Cir.1984). The primary purpose of the exhaustion doctrine is to prevent "premature interruption of the administrative process." *McKart, supra,* 395 U.S. at 193, 89 S.Ct. at 1662; *Athlone Industries v. Consumer Product Safety Commission,* 707 F.2d 1485, 1488 (D.C.Cir.1983); *Sterling Drug,*

---

fore seeking review in district court." 587 F.2d at 338. The court in *Massachusetts Electric* found this reasoning persuasive and followed *Fillinger.* From the language of the statute, however, it appears Congress simply provided blind vendors with the option to pursue an additional avenue of relief rather than mandated prior arbitration in each instance. In addition, there is no indication in the legislative history that Congress intended to impose arbitration as a prerequisite to judicial relief.

6 Cl.Ct. at 735 n. 12 (citation omitted).

The Claims Court found the decision in *Oklahoma, supra,* to provide support for its finding that arbitration under the Act is not mandatory, stating that in *Oklahoma,* "[t]he court implied that the blind licensee or agency has a choice whether to arbitrate or to seek judicial relief directly." *Id.* Upon close analysis, however, the *Oklahoma* decision provides only dubious support for the Claims Court's position. According to that decision:

The Randolph-Sheppard Act provides for arbitration of a state licensing agency's complaint regarding a federal department or agency's failure to comply with the provisions of the act or any regulations issued pursuant to it. Plaintiff filed an arbitration complaint more than a year ago with the Department of Education but has not obtained a decision and does not anticipate one will be rendered due to the recalcitrance of the Department of Defense. The defendant has not objected to the Court's consideration of this issue and accordingly, under these circumstances, plaintiff will not be required to exhaust its administrative remedies.

582 F.Supp. at 294 n. 2. The *Oklahoma* Court thus explicitly conditioned the circumstances under which a plaintiff would not be required to exhaust his remedies under the Act. Moreover, the Court appeared to rely on a proper application of the "futility" exception to the exhaustion requirement—where resort to arbitration would be "clearly useless" because the agency is unwilling, or as appeared there, unable because of another department's "recalcitrance," to consider the issue. *See, e.g., Baxter v. Claytor,* 652 F.2d 181, 185 (D.C.Cir.1981); *Lodge 1858, American Federation of Government Employees (AFGE) v. Paine,* 436 F.2d 882, 897 (D.C.Cir.1970). Because of the special circumstances present in the *Oklahoma* case, this case does not serve as strong precedent for a finding that the arbitration scheme of the Act is in usual circumstances discretionary.

It appears that this decision by the Claims Court has not previously been subjected to federal court review, and we decline to follow its conclusion.

*Inc. v. FTC*, 450 F.2d 698, 710 (D.C.Cir. 1971). Specifically, it preserves the autonomy of the administrative agency by allowing it to exercise its expertise and discretion on appropriate matters. *McKart, supra*, 395 U.S. at 194, 89 S.Ct. 1662; *Athlone Industries, supra*, 707 F.2d at 1488; *Sterling Drug, Inc., supra*, 450 F.2d at 710. In this regard, the exhaustion requirement prevents parties from the "frequent and deliberate flouting of administrative processes [which] could weaken the effectiveness of an agency." *Athlone Industries, supra*, 707 F.2d at 1488 (quoting *McKart, supra*, 395 U.S. at 195, 89 S.Ct. at 1663). Requiring exhaustion of the administrative process also promotes effective and efficient judicial review by ensuring that such review is of a fully developed factual record, and undertaken with the benefit of the agency's exercise of discretion or application of expertise. *McKart, supra*, 395 U.S. at 194, 89 S.Ct. at 1662; *Athlone Industries, supra*, 707 F.2d at 1488. Finally, requiring exhaustion of administrative remedies promotes judicial efficiency in another way, since decision by the agency may obviate the need for a judicial decision on the issue. *McKart, supra*, 395 U.S. at 195, 89 S.Ct. at 1663; *Athlone Industries, supra*, 707 F.2d at 1488; *Committee for GI Rights, supra*, 518 F.2d at 474; *Sterling Drug, Inc., supra*, 450 F.2d at 710–11.

Professor Davis has noted the "unpredictability of what a court will do with an exhaustion question," commenting that exhaustion "is about as unprincipled as any subject on which judicial opinions are written can be." K. Davis, *Administrative Law of the Seventies* § 20.07 (1976). In an effort to enhance both the predictability and principle behind exhaustion opinions, we examine the scope of the possible exceptions to the exhaustion requirement applied by the District Court.

The exception to the exhaustion requirement ostensibly applied by the District Court is where "any resort to arbitration would have been futile." 602 F.Supp. at 1015. As Professor Davis defines the exception, it applies where "following the administrative remedy would be futile *because of certainty of an adverse decision.*" 3 K. Davis, *Administrative Law Treatise* § 20.07 (1958) (emphasis added). The fact that an administrative agency lacks, or believes itself to lack, jurisdiction to act upon the dispute can make an adverse decision certain. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 641 n. 8, 95 S.Ct. 1225, 1230 n. 8, 43 L.Ed.2d 514 (1975); *McNeese v. Board of Education*, 373 U.S. 668, 674–76, 83 S.Ct. 1433, 1437–38, 10 L.Ed.2d 622 (1963); *Montana National Bank of Billings v. Yellowstone County*, 276 U.S. 499, 505, 48 S.Ct. 331, 333, 72 L.Ed. 678 (1928). An adverse decision can also be certain if an agency has articulated a very clear position on the issue which it has demonstrated it would be unwilling to reconsider. For example:

> [w]hen an agency has committed itself not to change its rules unless judicially compelled to do so, has made known that its general views are contrary to those of the complainant, and has never given an inkling that it would consider a matter afresh, and when the regulations in question have received careful attention within and outside the agency, a complainant need not make a *pro forma* request that the agency redo its system.

*Etelson v. Office of Personnel Management*, 684 F.2d 918, 925 (D.C.Cir.1982) (footnotes omitted). In *Etelson*, we noted that the futility exception has been inconsistently applied and "is subject to abuse." *Id.* Thus, even where the futility of arbitration was supported by these circumstances, we declined to decide that "standing alone, the apparent futility [of obtaining administrative relief] would allow [appellant] to raise his claim here." *Id.* at 925–26.

In other cases applying the futility exception to the exhaustion requirement, we have adhered strictly to the view that, to invoke the futility exception, resort to arbitration must appear "clearly useless," either because the agency charged with arbitration has indicated that it does not

have jurisdiction over the dispute, or because it has evidenced a strong stand on the issue in question and an unwillingness to reconsider the issue.[22] *Baxter, supra,* 652 F.2d at 185; *see Utah Power & Light Co. v. ICC,* 747 F.2d 721, 729 (D.C.Cir.1984) ("[A]ny request for rehearing would be denied."), *reh'g denied,* 764 F.2d 865 (D.C.Cir. 1985); *Athlone Industries, supra,* 707 F.2d at 1489 ("[I]t is highly unlikely that the [agency] would change its position if the case were remanded to it"); *Committee for GI Rights, supra,* 518 F.2d at 474 n. 20; *National Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 703 (D.C.Cir. 1974); *see also Daedalus Enterprises, Inc. v. Baldridge,* 563 F.Supp. 1345, 1350 (D.D. C.1983) ("[W]hen the agency has already made it abundantly obvious that it would not correct the error and would not conform its actions with the strictures of [the applicable statute], it would be meaningless to compel the hapless plaintiff to pursue further administrative remedies simply for form's sake."); *Hotel and Restaurant Employees Union, Local 25 v. Smith,* 563 F.Supp. 157, 161–62 (D.D.C.1983), *summary judgment granted,* 594 F.Supp. 502 (D.D.C.1984); *Gemmell v. FAA,* 558 F.Supp. 918, 920 (D.D.C.1982); *Walters v. Secretary of Defense,* 533 F.Supp. 1068, 1071–72 (D.D.C.1982), *rev'd on other grounds,* 725 F.2d 107 (D.C.Cir.1983), *reh'g denied en banc,* 737 F.2d 1038 (D.C.Cir. 1984); *Davis v. Bolger,* 496 F.Supp. 559, 567 (D.D.C.1980); *Feinberg v. Federal Deposit Insurance Corp.,* 420 F.Supp. 109, 114 (D.D.C.1976). The rule is that the exhaustion requirement may be waived in "only the most exceptional circumstances." *Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers,* 714 F.2d 163, 168–69 (D.C.Cir.1983) (quoting 4 K. Davis, *Administrative Law Treatise* § 26:10 at 460

(1983)); *see Association of National Advertisers, Inc., supra,* 627 F.2d at 1156 ("In rare circumstances, this court has considered extraordinary prejudgment claims prior to final agency action."); *Bristol-Myers Co. v. FTC,* 469 F.2d 1116, 1118 (2d Cir.1972). Even the probability of administrative denial of the relief requested does not excuse a failure to pursue arbitration. *Peter Kiewit Sons' Co., supra,* 714 F.2d at 168–69; *Spanish International Broadcasting Co. v. FCC,* 385 F.2d 615, 626 (D.C.Cir.1967). Thus, administrative delay could meet the futility exception only where it appears that agency inaction is in reality a statement by the agency of its unwillingness to consider the issue. *See Angel v. Pan American World Airways, Inc.,* 519 F.Supp. 1173, 1177 (D.D.C.1981) (finding the Civil Aeronautics Board's three year delay in acting upon plaintiff's petition to meet the futility exception), *overruled on other grounds, Paralyzed Veterans of America v. Civil Aeronautics Board,* 752 F.2d 694, 714 (D.C.Cir.), *cert. granted,* —— U.S. ——, 106 S.Ct. 244, 88 L.Ed.2d 253 (1985); *see also Smith v. Illinois Bell Telephone Co.,* 270 U.S. 587, 591, 46 S.Ct. 408, 409, 70 L.Ed. 747 (1926) (although not explicitly invoking the futility exception, finding that administrative remedies need not be exhausted where the agency "for a period of two years, remained practically dormant; and nothing in the circumstances suggest[ed] that it had any intention of going further with the matter.").

■ These definitions and applications of the futility exception to the exhaustion requirement are inconsistent with the District Court's application of the exception. Here, there has been no demonstration that the agency will certainly, or even probably,

---

**22.** Our previous decision in *Lodge 1858, AFGE,* 436 F.2d 882 (D.C.Cir.1970), cited by the District Court in support of its application of the futility exception, is not to the contrary. In that case, there was "a serious question as to whether the Civil Service Commission [the agency responsible for the administrative process at issue] possessed the necessary authority to determine the central legal issue" because "throughout the

administrative process, the Commission has disclaimed jurisdiction to correct, on the employees' appeals, the alleged improprieties." 436 F.2d at 897. Moreover, the Court found it unnecessary to rule on the exhaustion issue because before oral argument on appeal at least some of the appellants had exhausted their administrative remedies. *Id.*

deny relief. The Secretary of Education did not disclaim jurisdiction over the controversy. In fact, the Secretary of Education and other members of the Department of Education repeatedly expressed concern over the legality of the procurements at issue. J.A. at 48–52 (letters from Department of Education officials). The government's position in this litigation is that of the Defense Department only because of an executive order which gives the Department of Justice the authority to resolve inter-agency litigation disputes. Exec. Order No. 12146, *supra.* Despite the government's chosen litigation stance, the Act specifically gives the Secretary of Education the authority to arbitrate disputes between state agencies and other federal agencies. 20 U.S.C. § 107d–1(b). There is no reason to assume that the government's position in this litigation would inevitably prevail in arbitration. Consequently, there is no indication that resort to arbitration would be futile because of lack of jurisdiction of, or an unyielding position held by, the agency.

▉ There exist two other commonly recognized exceptions to the exhaustion requirement. The first of these is where administrative remedies are inadequate. *McNeese, supra,* 373 U.S. at 674–76, 83 S.Ct. at 1437–38; *Humana of South Carolina, Inc. v. Califano,* 590 F.2d 1070, 1081 (D.C.Cir.1978); *Wallace, supra,* 507 F.2d at 1190. The futility exception to the exhaustion requirement is actually a subpart of the inadequate remedy exception, since if resort to the administrative process is futile, the agency obviously will not provide adequate relief. Although the two exceptions may in some circumstances overlap, the concepts are distinct. "Futile" means "completely ineffective." *Webster's New Collegiate Dictionary* 468 (1977). "Inadequate" means "not ... lawfully and reasonably sufficient." *Id.* at 14, 578. We thus distinguish the two exceptions for the sake of conceptual clarity. Resort to the administrative process is *futile* if the agency will almost certainly deny any relief either because it has a preconceived position on, or lacks jurisdiction over, the matter. The administrative process is *inadequate* where the agency has expressed a willingness to act, but the relief it will provide through its action will not be sufficient to right the wrong. It is important to distinguish between these two concepts because the inquiries under the two exceptions differ. Under the futility exception a court must look to the agency's intentions regarding its position on the relevant issue and its statutory authority. When determining whether a remedy will be adequate, a court must consider all potential methods at the agency's disposal to remedy a violation if one is found.

The other exception to the exhaustion requirement is where irreparable injury would result unless immediate judicial review is permitted. *See Utah Fuel Co. v. National Bituminous Coal Commission,* 306 U.S. 56, 59–60, 59 S.Ct. 409, 410–11, 83 L.Ed. 483 (1939); *First Jersey Securities, Inc. v. Bergen,* 605 F.2d 690, 696–97 (3d Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); *Sears Roebuck & Co. v. NLRB,* 473 F.2d 91, 93 (D.C.Cir.1972), *cert. denied,* 415 U.S. 950, 94 S.Ct. 1474, 39 L.Ed.2d 566 (1974). Like the concepts of futility and inadequate remedy, the concepts of inadequate remedy and irreparable injury overlap in some senses, but nevertheless should remain conceptually distinct. As we have previously observed, in a statement which remains theoretically sound:

> In one sense, of course, the inadequate remedy requirement is indistinguishable from the irreparable injury requirement. The very thing which makes an injury "irreparable" is the fact that no remedy exists to repair it. ... [H]owever, the irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention. In contrast, the inadequate remedy test looks to the possibilities of alternate modes of relief, however serious the initial injury.

*Bannercroft Clothing Co. v. Renegotiation Board,* 466 F.2d 345, 356 n. 9 (D.C.Cir. 1972), *rev'd on other grounds,* 415 U.S. 1,

94 S.Ct. 1028, 39 L.Ed.2d 123 (1974), *vacated,* 495 F.2d 1074 (D.C.Cir.1974).

The District Court appears to have found that the case before it met both the inadequate remedy and irreparable injury exceptions to the exhaustion requirement. The District Court based its decision to waive the exhaustion requirement on "pragmatic considerations." 602 F.Supp. at 1015. Reading between the lines, it appears that the District Court found first, that appellants would suffer irreparable injury if the relief of full rescission of the disputed contracts were not available after the administrative process. Second, the District Court appears to have found that the arbitration process would be inadequate because the Secretary would be unable to rescind the contracts in their entirety. We address these implicit findings in turn.

■ The usual time and effort required to pursue an administrative remedy does not constitute irreparable injury.[23] *Renegotiation Board v. Bannercroft Clothing Co.,* 415 U.S. 1, 24, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123 (1974); *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974); *Myers, supra,* 303 U.S. at 51–52, 58 S.Ct. at 463–64; *Sears Roebuck & Co., supra,* 473 F.2d at 93. Absent a "clear showing of irreparable injury" on some additional basis, the "failure to exhaust administrative remedies serves as a bar to judicial intervention in the agency process." *Renegotiation Board, supra,* 415 U.S. at 24, 94 S.Ct. at 1040; *see Myers, supra,* 303 U.S. at 51–52, 58 S.Ct. at 463–65; *Sears Roebuck & Co., supra,* 473 F.2d at 93. Only under extraordinary circumstances will administrative delay lead to a "clear showing of irreparable injury." *Renegotiation Board, supra,* 415 U.S. at 24, 94 S.Ct. at 1040. The Supreme Court found administrative delay by a state commerce commission to result in irreparable injury where:

the commission, for a period of two years, remained practically dormant; and nothing in the circumstances suggests that it had any intention of going further with the matter. For this apparent neglect on the part of the commission, no reason or excuse has been given.

*Smith, supra,* 270 U.S. at 591, 46 S.Ct. at 409. But, in *Smith,* the facts cited to demonstrate administrative delay could in fact have supported a finding of futility, since the Court found no indication that the commission intended to fulfill its administrative responsibilities. Moreover, the *Smith* Court found that the injury threatened was of constitutional magnitude—the taking of property without due process of law. According to the Court:

> Property may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them; and where, in that respect, such a state of facts is disclosed as we have here, the injured public service company is not required indefinitely to await a decision of the rate-making tribunal before applying to a federal court for equitable relief.

*Id.* at 591–92, 46 S.Ct. at 409–10. The Supreme Court's decision in *Smith* thus established only a narrow circumstance in which waiver of the exhaustion requirement is appropriate due to administrative delay.

■ Here, there is no evidence of unusual delay in the administrative process or of neglect on the part of the agency. Moreover, the right at issue is statutory, and denial of the right appears to threaten only economic injury. Economic loss does not, in and of itself, constitute irreparable harm. *Sampson, supra,* 415 U.S. at 90, 94 S.Ct. at 952; *Wisconsin Gas Co. v. Federal Energy Regulatory Commission,* 758 F.2d 669, 674 (D.C.Cir.1985); *Virginia Petrole-*

---

**23.** In the related context of agency adjudication and rulemaking, the Administrative Procedure Act authorizes a court to "compel agency action ... *unreasonably* delayed." 5 U.S.C. § 706(1) (emphasis added). *See Costle v. Pacific Legal Foundation,* 445 U.S. 198, 220 n. 14, 100 S.Ct. 1095, 1108 n. 14, 63 L.Ed.2d 329 (1980), *reh'g denied,* 446 U.S. 947, 100 S.Ct. 2177, 64 L.Ed.2d 804 (1980); *Telecommunications Research & Action Center, supra,* 750 F.2d at 79–80; *MCI Telecommunications Corp. v. FCC,* 627 F.2d 322, 340 (D.C.Cir.1980).

*um Jobbers Association v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). Also, because the right at issue is created by statute, there is a strong presumption that the statutory dispute resolution mechanism should be followed. *See, e.g., Babcock, supra*, 250 U.S. at 331, 39 S.Ct. at 465. In fact, the statutory dispute resolution mechanism is properly viewed as part and parcel of the right granted appellants under the Act. By creating such a statutory arbitration scheme, Congress must have contemplated that with the benefit of the statutory right, appellants should accept the relative burden of an administrative, as opposed to an immediate judicial, remedy. Absent clear evidence that the right granted under the statute will be lost without judicial intervention, a court should be loath to disturb this balance.

There is also a substantial question as to whether a speedy judicial ruling on the merits was, or is, even necessary to preserve appellants' statutory rights. In this analysis, the irreparable injury inquiry merges into the question of whether there exists an adequate administrative remedy, because appellants' threatened injury will not be "irreparable" if there "exists [a remedy] to repair it." *Bannercroft Clothing Co., supra*, 466 F.2d at 356 n. 9. That is, where the exhaustion requirement affects "only the timing, [and] not the effectiveness of judicial review," a waiver of the requirement is not justified. *First Jersey Securities, Inc., supra*, 605 F.2d at 697 (quoting *Barnes v. Chatterton*, 515 F.2d 916, 921 (3d Cir.1975)).

First, it is not clear that invalidation of the contracts would be impossible after an arbitration proceeding. Congress contemplated that "[i]f a Federal agency is found in violation of the Act or [a] regulation, its head shall cause such violations to be terminated, and shall take such other action as [is] necessary to carry out the panel's decision." Sen. Report at 29. Thus, the Secretary of Education has broad remedial powers under the Act. Even assuming, however, that invalidation of the contracts would be impossible once construction of the fast-food facilities were underway, it appears that other remedies available to the Secretary of Education could provide appellants with full relief. Most fundamentally, there appears at this preliminary stage to be no reason why the Secretary could not provide the same, or similar, expedited consideration of the merits as did the District Court. Furthermore, even if the Secretary did not provide comparable expedited consideration, his authority under the Act to provide *post hoc* remedies is broad. *See* 20 U.S.C. § 107d–2. Without attempting to preempt the administrative process or prejudge the product of it, a review of some possible remedies suggests that appellants could well receive adequate relief after arbitration. As to appellants' complaints regarding notice, it is alleged without contradiction that this violation, if it is one, has already occurred. It thus appears that expedited consideration of this alleged violation of the Act could not provide appellants with greater relief than could a nonexpedited proceeding. If a violation is found, it may well be that the Secretary can provide prospective relief as to future similar contract solicitations or building acquisitions or renovations. If he finds that the lack of notice here resulted in injury under the Act, the Secretary ought to be able to fashion an appropriate remedy, e.g., require the Defense Department to afford a blind vendor an opportunity at some, or all, sites. As to the alleged violations of the "priority" and "limitation" provisions of the Act, 20 U.S.C. § 107, if a violation is found, the Secretary might well be able to require the government entities to place blind vendors somewhere on the entire property at issue, or require the specific buildings at issue to contain a satisfactory site for a blind vendor. Moreover, the McDonald's fast-food facilities are franchised and the Burger King facilities are actually operated by Army and Air Force personnel. Very possibly the Secre-

tary could require that blind persons be franchised to operate, or at least be employed, at some or all of the facilities. If such remedies were employed by the Secretary after an arbitration proceeding, and approved on review, a wholesale invalidation of the contracts might not be necessary to compensate appellants for injury suffered under the Act. Consequently, a speedy ruling on the merits may not have been, or be, essential to remedy any violations of statutory rights found after arbitration to have been committed.

Even assuming that invalidation of the contracts in their entirety were necessary to preserve appellants' rights under the Act, an expedited judicial decision on the merits was not the appropriate method for a federal court to guarantee this relief. Instead of seeking a decision on the merits, appellants should have sought a stay or an injunction against the contract awards pending arbitration. Fed.R.Civ.P. 65(a); *see Train, supra,* 510 F.2d at 703; *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1305 (D.C.Cir.1971); *Wheelabrator Corp. v. Chafee,* 455 F.2d 1306, 1316–17 (D.C.Cir.1971). The action was in fact before the District Court on plaintiffs' motion for a preliminary injunction. The preliminary injunction, however, was sought pending *judicial decision,* not arbitration. The government agreed, absent a court order, to halt ongoing construction on the majority of the fast-food facilities pending an expedited decision on the merits by the District Court. 602 F.Supp. at 1009. The District Court thus declined to decide the preliminary injunction issue in favor of reaching an immediate final decision on the merits.

The preliminary injunction inquiry, however, is delicately balanced to avoid a hasty judicial decision on the merits, while protecting the parties' rights from irreparable injury. *WMATC v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977); *Virginia Petroleum Jobbers Association, su-*

*pra,* 259 F.2d at 925. In the context of an administrative process, this inquiry is especially important because only in "exceptional circumstances," *Peter Kiewit and Sons',* *supra,* 714 F.2d at 168–69, should a court allow the parties to circumvent an administrative process in favor of a judicial decision.

In deciding whether to grant a preliminary injunction, a court must consider: (1) whether plaintiff is likely to prevail on the merits; (2) whether plaintiff has shown that he will suffer irreparable injury absent interim relief; (3) whether injunctive relief would significantly harm other interested parties; and (4) whether the public interest would be served by granting or denying preliminary relief. *Holiday Tours, Inc.,* *supra,* 559 F.2d at 843; *Virginia Petroleum Jobbers Association, supra,* 259 F.2d at 925. Thus in this case, had the parties sought a preliminary injunction pending arbitration, decision on the motion would have been under the same irreparable injury standard applied by the District Court in determining not to require exhaustion. *Id.* Instead of justifying waiver of the exhaustion requirement, the same finding that appellants' rights would be lost absent a speedy ruling may well have justified an injunction against the contract award pending arbitration. The standard for determining whether to grant a preliminary injunction, however, specifically requires a court to consider not only the harm threatened to the plaintiffs, but the likelihood of plaintiffs' success on the merits, and the relative harms to the parties and the public interest from granting or denying the motion. These additional facets of the preliminary injunction inquiry ensure that its purpose is fulfilled—safeguarding appellants' rights with the least possible intrusion on the administrative process.

Here, the District Court found that appellants were unlikely to prevail on the merits as to their broad interpretation of the Act.[24] Under a preliminary injunction

---

**24.** On a motion for a preliminary injunction pending *arbitration,* an analysis of a plaintiff's likelihood of success on the merits should look to the result of an administrative, not judicial, determination. Such an analysis in this case, in light of the expressed concern of individuals

analysis, this finding would modify the District Court's presumption that appellants would suffer irreparable injury pending arbitration. That is, a finding that appellants were unlikely to prove that their substantive rights had been violated would have meant that they probably would not suffer irreparable injury pending a decision on the merits. Moreover, the District Court appeared to contemplate that the Defense Department would suffer substantial harm were construction on the contracts stayed for any significant length of time. Thus, the balance of factors as it appeared to the District Court may well have caused it to deny the preliminary injunction. Yet, even by denying the preliminary injunction, the purpose of the inquiry is fulfilled. By focusing its inquiry on the merits on appellants' likelihood of success in the *administrative process*, the District Court would have avoided a final judicial determination of the merits and thus would have preserved appellants' right to full administrative consideration of the controversy.

The most important result of a merits inquiry which focused only on appellants' right to a preliminary injunction would have been to preserve the role of the Secretary of Education under the Act. Congress explicitly charged the Secretary of Education with interpreting and administering the Act. 20 U.S.C. §§ 107, 107d–1(a), (b). The strong policy concerns which support the exhaustion requirement, *see, e.g., McKart, supra,* 395 U.S. at 193–95, 89 S.Ct. at 1662–63; *Athlone Industries, supra,* 707 F.2d at 1488; *Committee for GI Rights, supra,* 518 F.2d at 474, dictate that a court should defer this dispute to the agency charged with the Act's administration. Because a primary component of the relief requested by appellants is an interpretation of the statute at issue which will bind future contract solicitations, it is especially important that the Secretary of Education "be given the first chance ... to apply [his] expertise." *McKart, supra,* 395 U.S. at 194, 89 S.Ct. at 1663. Resolution of

this controversy requires factual development as to the nature of the Defense Department's actions and as to how these particular actions relate to the requirements of the statute and regulations. The scope of the statute and the regulations promulgated thereunder should, in the first instance, be one for the agency charged with its administration. *League of United Latin American Citizens v. Hampton,* 501 F.2d 843, 847 (D.C.Cir.1974). Judicial review could then be of a fully developed and reasoned agency decision, and agency decision could narrow the issues necessary for a court to consider. *Id.* Moreover, appellants could well obtain the relief they seek at the agency level, potentially obviating the need for judicial review. In fact, appellants may find that decision by the agency with specific expertise in administering the Act, even though through a more time-consuming process, may provide them with more solid and sure relief than expedited consideration in federal court.

\* \* \* \* \* \*

Appellants have failed to demonstrate adequate grounds upon which the requirement that they exhaust their administrative remedies should be waived. Accordingly, the District Court was in error in reaching the merits of the case. This Court will vacate the District Court's grant of summary judgment for defendants and will remand to the District Court with an order to dismiss the action without prejudice to any party pursuing the arbitration procedure contemplated by the Act and thus ultimately being entitled to judicial review of the arbitration decision as a final agency action. Such dismissal should also be without prejudice to any party, in an appropriate circumstance, applying for a preliminary injunction pending arbitration.

within the Department of Education, could arguably have led the District Court to find a greater likelihood of success on the merits. *See*

J.A. at 48–52 (letters from Department of Education officials).